**NORTHEASTERN TELEPHONE COMPANY, Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY et al., Defendants.**

Civ. A. No. B–75–319.

United States District Court, D. Connecticut.

July 30, 1980.

J. Daniel Sagarin, Schless & Sagarin, Bridgeport, Conn., Philip E. McCleery, pro hac vice, J. Robert Sheehy, pro hac vice, Sheehy, Lovelace & Mayfield, Waco, Tex., for plaintiff.

Marshall Collins, Asst. Atty. Gen., Hartford, Conn., for amicus curiae.

John M. Goodman, Leonard Joseph, J. Paul McGrath, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Lewis H. Ulman and Peter J. Tyrrell, William J. O'Keefe, Anne U. MacClintock, Southern New England Telephone Co., New Haven, Conn., William R. Moller, Moller & Horton, Hartford, Conn., Burton K. Katkin, New York City, for defendants.

EGINTON, District Judge.

### RULING ON POST–TRIAL MOTIONS

This case presents a number of important issues concerning the application of the antitrust laws to a regulated telephone utility in the business terminal equipment market.

These issues arise in the context of a private treble damage action brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15, and tried to a jury.

## FACTUAL BACKGROUND

Plaintiff, Northeastern Telephone Company ("Northeastern"), is a supplier of certain types of telephone terminal equipment and has been engaged in the sale, installation, and servicing of such equipment in the State of Connecticut since 1972. Northeastern is not licensed to provide, and does not provide, telephone service, but instead sells terminal equipment directly to users who obtain service from telecommunication common carriers. When Northeastern entered the terminal equipment business, it did so with a small amount of capital and over the past eight years has managed to achieve an impressive record of growth. The company started with only its two founders doing primarily maintenance work on telephone systems sold and installed by International Telephone & Telegraph; it now has over fifty employees. Initially, Northeastern operated out of part of a building that was formerly a church; since then, it has expanded at the rate of approximately one new office every year and now has permanent facilities in Stamford, Hartford, New London, Danbury, and Waterbury, in addition to new headquarters in Milford. Northeastern's revenues its first year were approximately $70,000; in its seventh year, it posted sales of over $3,000,-000.

Defendants American Telephone & Telegraph ("AT&T"), Southern New England Telephone Company ("SNET"), and Western Electric Company ("Western Electric"), are parts of an integrated telecommunication common carrier enterprise known as the Bell System, which enterprise, in cooperation with some 1600 independent telephone companies, owns, operates, and manages the nationwide telecommunications network. As a part of its telecommunications services, the Bell System provides terminal equipment to its customers under tariffs that have been filed with appropriate regulatory agencies. AT&T is the parent company of the Bell System and has an interest in twenty–three operating telephone companies, which provide most of the local telephone service in the country. AT&T's Long Lines Department, in cooperation with these companies and with the non–Bell System telephone companies, coordinates and supervises the long distance telephone service in this country. AT&T has entered into License Contracts with each of the Bell System operating companies, under which AT&T's general departments provide those operating companies with a vast array of services.

SNET, one of the two Bell System operating companies in which AT&T owns only a minority interest, is specially chartered by the Connecticut General Assembly to provide telephone service in virtually all of Connecticut. It provides basic residential and business service, intercity toll service, and a variety of other business, public, and residential services, including provision of terminal equipment. SNET, unlike many of its competitors, does not sell terminal equipment as such. Rather, it provides it customers with terminal equipment through a variety of different lease–type arrangements.

Almost all of Western Electric's business involves the manufacture and supply of telephone equipment for Bell System companies. The operating companies, like SNET, are not required, however, to acquire such equipment from Western Electric, and are free to acquire such equipment from other manufacturers. During most of the period in question in this suit, SNET purchased much of its private branch exchange equipment from Nippon Electric Company (a Japanese company which also supplied Northeastern), while it bought its key telephone system equipment from Western.

This suit was instituted on October 22, 1975. The amended complaint, filed two weeks after the commencement of trial, alleged that defendants monopolized, attempted and conspired to monopolize, and restrained trade in the business terminal equipment market in the State of Connecti-

cut in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. The request for relief included treble damages, attorney fees, and costs as provided for under section 4 of the Clayton Act, 15 U.S.C. § 15. A preliminary injunction was sought and subsequently abandoned in reliance on an agreement among the parties to proceed promptly to trial. Northeastern no longer asserts any claims for equitable relief.

This action involves two general types of telephone terminal equipment: private branch exchanges and key telephone systems. A private branch exchange ("PBX") consists of equipment connected to the telephone network located on a customer's premises which can switch calls from one telephone to another, a switchboard to control that operation, and the associated telephone sets and wiring. A key telephone system ("KTS") consists of a group of ordinary telephones, usually used in offices, which provide the user with a number of buttons or keys which permit access to a multiplicity of communications lines for incoming or outgoing calls from a single telephone station.

Until 1969, federal and state tariffs generally required that equipment connected to the telephone network be supplied and maintained by an operating telephone company (one of the 23 affiliated with the Bell System or one of the more than 1600 independent operating companies). In *Use of the Carterfone Device in Message Toll Telephone Service*, 13 F.C.C.2d 420, *reconsideration denied*, 14 F.C.C.2d 571 (1968), the Federal Communications Commission ("FCC") embarked upon a major reform of telephone interconnection. In that decision, the FCC ruled that defendants' tariffs prohibiting interconnection were unreasonable and unlawful under The Communications Act of 1934, 47 U.S.C. §§ 151 *et seq.* The Bell System responded to *Carterfone* by filing revised tariffs which, *inter alia*, permitted the direct electrical interconnection of customer–provided equipment through a protective connecting arrangement ("PCA") provided, installed, and maintained by the telephone companies at the customer's expense.

Trial began on October 10, 1979. By agreement of counsel, the trial was bifurcated; liability was tried first, damages were then determined in a separate trial before the same jury. The parties stipulated that the relevant product and geographic market was the market for business terminal equipment, namely, PBXs and KTSs provided to business customers, in those areas in the State of Connecticut in which SNET provided local exchange service. The liability portion of the trial, including summations and the Court's charge, lasted twenty–one days.

In order to facilitate orderly decision–making and to ensure particularized appellate review, the Court submitted to the jury fourteen interrogatories on the liability issues. After one and one–half days of deliberations, the jury returned a liability verdict for Northeastern on all counts, finding that: (1) SNET had monopolized the relevant market; (2) SNET had attempted to monopolize the relevant market; (3) all three defendants had engaged in a conspiracy to monopolize the relevant market; and (4) all three defendants had engaged in a conspiracy to restrain trade. The damages portion of the trial lasted five days, and after two and one–half days of deliberations, the jury returned a verdict in favor of Northeastern in the amount of $5,515,692. $3,368,906 of this amount was for lost profits; $2,146,786 was for damage to going concern value. Pursuant to section 4 of the Clayton Act, the Court ordered that the amount be trebled and that judgment enter in the amount of $16,547,076.

Pursuant to Fed.R.Civ.P. 50(b) and 59, defendants have moved for judgment notwithstanding the verdict, or in the alternative, for a new trial.[1] The motion is based

---

1. At the end of Northeastern's case, both on liability and damages, defendants moved for a directed verdict. Defendants renewed their motion at the close of all evidence at both trials. These motions were denied by the Court and all issues were permitted to go to the jury.

on four grounds: (1) that the conduct that the jury found to be anticompetitive or predatory is within the exclusive jurisdiction of regulatory agencies and is immune from the antitrust laws; (2) that the evidence is legally insufficient to support the jury's verdict; (3) that Northeastern's proof of damages was defective; and (4) that there were errors in the selection of the jury and the charge to the jury. Also before the Court is Northeastern's application for an award of attorneys' fees.

## I

## IMPLIED ANTITRUST IMMUNITY

Defendants' initial contention in their motion for judgment n.o.v. is that the conduct for which they have been found liable falls within the exclusive jurisdiction of regulatory agencies and is immune from the antitrust laws because of pervasive regulation under a public interest standard. This same argument was made by defendants in their pretrial motion to dismiss and was extensively briefed and argued by the parties at that time. Judge T. F. Gilroy Daly,[2] in denying the motion to dismiss,[3] found that defendants had not made the requisite showing to support an implied immunity from the antitrust laws. *Northeastern Telephone Co. v. American Telephone & Telegraph Co.*, 477 F.Supp. 251 (D.Conn.1978) [hereinafter "*Northeastern*"]. This Court is in full accord with Judge Daly's ruling on the immunity issue and therefore will not undertake a complete review of the legal issues.[4] Rather, the Court will address the immunity arguments solely in the context of the evidence adduced at trial.

At the outset, it is important to distinguish between that conduct which is subject to federal regulation and that conduct involved in this case which is regulated by a state agency. The only area of conduct raised in this action which is directly regulated by the FCC is that of interconnection policy and the PCAs. The remaining areas of conduct–pricing, advertising, marketing, new products, and use of the utility function–are all areas of conduct regulated, if at all, by the Department of Public Utility Control ("DPUC").[5] Because of the differing legal standards applicable to conduct regulated at the federal level and conduct regulated at the state level, each of these areas is discussed separately.

### A. *Federally Regulated Conduct*

A brief review of the controlling legal principles is appropriate. The Communications Act of 1934 does not include an explicit, general exemption of FCC regulated activities from the antitrust laws. The issue, therefore, becomes one of implied immunity. The Supreme Court has held that there are only two restricted instances where an implied immunity may be found for business conduct subject to regulation under a federal regulatory scheme. First, immunity will be implied where the regulatory scheme established by Congress is so pervasive as to impliedly repeal the antitrust laws. *United States v. National Association of Securities Dealers, Inc.*, 422 U.S. 694, 730–35, 95 S.Ct. 2427, 2448–2450, 45 L.Ed.2d 486 (1975); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 372–75, 93 S.Ct. 1022,

---

Though expressing doubt about the strength of some of Northeastern's claims, the Court recognized that it is normally "in the best interests of efficient judicial administration for the trial judge to refrain from considering a motion for a directed verdict in favor of deciding a motion for judgment n.o.v." *Mattivi v. South African Marine Corp.*, 618 F.2d 163, 166 n.2 (2d Cir. 1980).

2. This case was transferred to the undersigned on August 1, 1979 solely for the purpose of pretrial and trial. Prior to that date, the case was assigned to the Hon. T.F. Gilroy Daly.

3. The motion was granted with respect to Count Six of the Complaint which asserted a claim under the Connecticut Antitrust Act, Conn.Gen.Stat. §§ 35–24 *et seq.*

4. The Court's decision to adhere to Judge Daly's ruling is based upon its own independent assessment of the various legal issues and not on a rote application of *res judicata* or the law of the case doctrine.

5. Formerly the Public Utilities Control Authority.

1027–1028, 35 L.Ed.2d 359 (1973). Second, immunity will be implied where application of the antitrust laws to the particular conduct challenged–in this case, the design of the PCA–would conflict with the requirements of the regulatory scheme in such a way that the scheme would be rendered unworkable. *Gordon v. New York Stock Exchange, Inc.*, 422 U.S. 659, 685–86, 691, 95 S.Ct. 2598, 2612–2613, 2615, 45 L.Ed.2d 463 (1975).

In either case, "[r]epeal of the antitrust laws by implication is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." *Gordon v. New York Stock Exchange, Inc.*, *supra*, at 682, 95 S.Ct. at 2611, *citing United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963). Additionally, "[r]epeal is to be regarded as implied only if necessary to make the [regulatory scheme] work, and even then only to the minimum extent necessary." *Silver v. New York Stock Exchange*, 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963).

Against this backdrop of legal principles, Judge Daly, after a thorough discussion of the FCC regulatory scheme and the FCC proceedings concerning the interconnect issue, and a detailed analysis of Supreme Court decisions which have considered implied antitrust immunity in other regulated industries, held that "neither the regulatory framework of the Communications Act of 1934 nor the particular regulatory efforts by the FCC require[d] an immunity for the challenged conduct" and that "application of the antitrust laws [would] be neither

disruptive nor unnecessary." *Northeastern* at 260.[6]

Defendants now argue that the evidence adduced at trial compels a contrary result. In support of their claim, defendants point to a National Academy of Sciences ("NAS") study, "A Technical Analysis of the Common Carrier/User Interconnections Area," and the testimony of Lawrence Hohmann, Director of Facilities Engineering for AT&T. Defendants apparently contend that this evidence demonstrates the pervasive regulation exercised by the FCC over interconnect matters.

As noted previously, AT&T, in response to the *Carterfone* decision, filed tariff revisions permitting direct electrical connection of terminal equipment through a PCA provided, installed, and maintained by Bell System companies at the customer's expense. The FCC permitted the tariff revisions to go into effect but explicitly reserved decision on their lawfulness. *American Telephone & Telegraph Co. (AT&T) "Foreign Attachment" Tariff Revisions*, 15 F.C.C.2d 605, 610 (1968), *reconsideration denied*, 18 F.C.C.2d 871, 874 (1969).[7]

Shortly after the filing of these tariff revisions, the FCC undertook an investigation of the interconnect question, commissioning a study by the NAS. The NAS panel which was given responsibility for the study was comprised of persons from government, industry, and academia. The panel's primary function was "to make an assessment of the technical factors affecting the common carrier/user interconnection area of public communications."

---

**6.** One aspect not considered by Judge Daly at any length was the legislative and administrative history of the Communications Act. To the extent that it bears on the instant analysis, it plainly reinforces the decision reached by Judge Daly. *See, e. g., Essential Communications Sys., Inc. v. American Tel. & Tel. Co.*, 610 F.2d 1114, 1117–21 (3d Cir. 1979); *Litton Sys., Inc. v. American Tel. & Tel. Co.*, 487 F.Supp. 942, 947–50 (S.D.N.Y.1980).

**7.** The basis for defendants' oft–repeated assertion that the FCC "approved" the tariff revision is difficult to discern. The FCC in its *Foreign*

*Attachment* ruling plainly stated that "we will permit the tariff revisions to become effective as scheduled with the understanding that in doing so we are not giving any specific approval to the revised tariffs." 15 F.C.C.2d at 610. In denying reconsideration of the ruling, the FCC further stated that "[p]aragraph 27 of our decision is clear in its statement that 'our action is not to be construed as approval thereof and these tariffs are subject to such further action as the Commission may wish to take with respect thereto.'" 18 F.C.C.2d at 874.

The panel studied the interconnect issue for over a year and presented its report to the FCC on June 10, 1970. The report concluded that "uncontrolled interconnection to the common carrier network . . would be harmful." The report went on to identify specifically the kinds of harm that might result from such interconnection. The primary harms included hazardous voltages, line imbalance, excessive signal levels, and improper network signalling. The panel found that the requirement of a protective connecting arrangement provided by the carrier to insulate the network from customer–provided equipment was one reasonable method of preventing these harms. As yet another possibility, the panel suggested the institution of an ongoing program of standardization and properly enforced certification of equipment, installation, and maintenance. The panel did not undertake to determine which of these alternatives was preferable, stating that such a decision was beyond the purview of its study.

In addition to the NAS study, defendants also offered the Hohmann testimony mentioned above. Hohmann was personally involved with the work of the NAS panel. He served primarily as the AT&T contact to the NAS panel and was responsible for the submission of reports and other documents by AT&T to the panel. Hohmann's testimony concerned the general background of the FCC's interest in interconnection, AT&T's position and response, and the highlights of the principal findings of the NAS study.

■ Defendants submit that this testimony, taken in conjunction with the NAS study itself, compels a finding of pervasive regulation, and thus, implied immunity. This Court disagrees. First, the NAS study was explicitly considered by Judge Daly in his ruling on the motion to dismiss. *Northeastern* at 254. Second, the NAS study and the testimony of Hohmann are relevant, if

at all, solely to the question of the reasonableness of the tariff revisions permitting interconnection and to the reasonableness of the PCA design; evidence more properly directed to the liability question than to the immunity issue. This evidence does not compel a finding of plain repugnancy between the FCC's authority to permit filed tariffs to become effective simply by their filing and this Court's authority to provide a remedy to competitors who are injured by anticompetitive conduct engaged in pursuant to those tariffs. Despite the FCC's "extensive" investigation of the interconnect question, the FCC's regulation of the interconnect area falls far short of being pervasive, and such regulation cannot support a finding of implied immunity for the anticompetitive conduct engaged in by the defendants.[8]

### B. *State Action*

Most of the conduct found by the jury to be anticompetitive or predatory is conduct regulated by the Connecticut DPUC. Defendants forcefully contend that they are immune from liability with respect to this conduct under the "state action" doctrine enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Again, a brief review of the controlling principles is necessary.

■ In determining whether anticompetitive conduct engaged in by *private* parties, such as defendants, enjoys immunity under the state action doctrine, there are three principal inquiries: first, whether under state law defendants are compelled to engage in the anticompetitive conduct; second, whether such conduct is pursuant to a "clearly articulated and affirmatively expressed goal" to "displace unfettered business freedom"; and third, whether the anticompetitive or predatory conduct is necessary to effectuate state policy. *Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978);

8. This result finds strong support in a series of recent decisions. *See, e. g., Essential Communications Sys., Inc. v. American Tel. & Tel. Co.*, supra; *Litton Sys., Inc. v. American Tel. & Tel.* *Co., supra*; *Sound, Inc. v. American Tel. & Tel. Co.*, 1979–2 Trade Cas. ʽ 62,978 (D.Iowa 1979); *Jarvis, Inc. v. American Tel. & Tel. Co.*, 481 F.Supp. 120 (D.D.C.1978).

*Bates v. State Bar of Arizona*, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).[9]

■ Defendants' strongest case for immunity lies with their pricing practices for terminal equipment. As defendants correctly point out, the DPUC has actively exercised its regulatory authority over SNET's pricing practices. Defendants presented a great deal of evidence on this point through the testimony of SNET officers, as well as the former DPUC Chairman. The substantially unrebutted testimony demonstrated that the DPUC actively regulated SNET's pricing practices through, *inter alia*, extensive hearings on rate proposals and rate applications, investigations into SNET proposals, day–to–day supervision of SNET's affairs, detailed analyses of SNET's pricing methodologies and payment options, and specific approval of much of the conduct that the jury found to be anticompetitive.

Based on this, defendants appear to make two arguments. First, they argue that immunity is necessitated for the pricing practices because such practices are actively regulated by the DPUC under a public interest standard that is fundamentally inconsistent with the antitrust laws. This argument was specifically rejected by the Supreme Court in *Cantor v. Detroit Edison Co., supra*, 428 U.S. at 595, 96 S.Ct. at 3119, and by Judge Daly in his ruling on the motion to dismiss. *Northeastern* at 263. The evidence adduced at trial does not compel a contrary result.

Second, defendants argue that the jury verdict will place SNET in the position of being told by this Court that its pricing practices and payment options were illegal at a time when they were still contained in a tariff by which it was under a legal obligation to abide. In short, they claim the verdict will "leave SNET like a trapped chess piece–vulnerable where it is but blocked from moving to safety."

This assertion may well be true. Yet, it is clear that this is a situation of defendants' own making. Defendants have engaged in conduct which a jury has found to be anticompetitive under the antitrust laws. It is conduct which defendants initiated and engaged in at their own instance, and which was simply approved by the DPUC. There was no evidence adduced at trial which demonstrated that the DPUC in the first instance compelled SNET or the other defendants to file tariffs containing rates which were predatory or payment plans which were anticompetitive. Although the tariffs were filed at the direction of the DPUC, and could not be changed without their approval, the anticompetitive conduct was primarily the result of defendants' independent business judgment. *Cantor v. Detroit Edison Co., supra*, 428 U.S. at 593–94, 596, 96 S.Ct. at 3118–3119, 3120. The evidence of the DPUC's regulation over SNET's affairs is evidence again more properly directed to liability, that is, to the reasonableness of its conduct.

Having found no state action immunity for the pricing practices engaged in by defendants, it follows that there can be no immunity for the other areas of anticompetitive conduct which are regulated, if at all, to a much lesser degree. *Northeastern* at 264 n.24.

---

9. This formulation of the test for determining state action immunity for private parties is somewhat dissimilar from that set forth by Judge Daly. The principal difference is that this Court finds that a necessary element of state action immunity in these circumstances is that the state compel the anticompetitive act. Judge Daly, relying on *Mobilfone of Northeastern Pa., Inc. v. Commonwealth Tel. Co.*, 571 F.2d 141, 144 (3d Cir. 1978), apparently found no such requirement.

The fact that courts have differed in considering the appropriate test for determining state action immunity is hardly surprising. The Supreme Court's recent decisions in this area -*Goldfarb, Cantor, Bates,* and *Lafayette* -are confusing at best. "The . . . issue raised by this . . . quartet of decisions is whether anyone can make sense of what the Supreme Court is letting us know about the state action doctrine." M. Handler, *Antitrust–1978*, 78 Colum.L.Rev. 1363, 1376 (1978).

## II

## THE EVIDENCE

Having determined that defendants are not immune from the antitrust laws, the Court now turns to a consideration of whether the evidence presented at trial was sufficient to support the jury's verdicts. The standard in this circuit for judgment n. o. v. in an antitrust case is well–settled and not in dispute. *See National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 956 (2d Cir. 1978). It is sufficient to note for purposes of this case that where there is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the [motion for judgment n. o. v.] should be denied." *Id. quoting Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969). In this regard, the Court is "bound to view the evidence in the light most favorable to [the plaintiff] and to give [it] the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Michelman v. Clark–Schwebel Fiber Glass Corp.*, 534 F.2d 1036, 1042 (2d Cir. 1976), *quoting Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962).

### A. *Monopolization*

Defendants first attack the jury's verdict on the monopolization claim. On this issue, the jury was instructed to answer four questions. Questions 1 and 2 asked whether SNET possessed the power in the relevant market to (1) control prices or (2) exclude competition. Question 3, which had six parts, asked whether SNET maintained

monopoly power through predatory or anti-competitive means by the following acts or practices: (a) pricing; (b) protective coupler; (c) advertising practices; (d) marketing; (e) use of utility function; and (f) new products. Question 4 asked whether the anticompetitive acts or practices were the proximate cause of any injury to Northeastern. The jury answered "yes" to all questions.

█ Monopolization requires proof of two elements: the possession of monopoly power in the relevant market; and the deliberate and unlawful acquisition or maintenance of that power. *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966). The requisites of monopoly power are well understood as "the power to control prices or exclude competition." *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). "Section 2 . . . is aimed primarily not at improper conduct but at a pernicious market structure in which the concentration of power saps the salubrious influence of competition." *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 272 (2d Cir. 1979).

Defendants apparently do not seriously contest the jury's findings that SNET had monopoly power, that is, the power to control prices or to exclude competition in the terminal equipment market in the State of Connecticut. Accordingly, extended discussion of this aspect of the monopolization claim is not warranted. It is sufficient simply to note that the evidence on, *inter alia*, market structure,[10] SNET's ability to retain a high percentage of the market with

---

**10.** Defendants argue that market share statistics in the context of a regulated utility which had 100% of the market in 1968 are meaningless in determining whether SNET possessed monopoly power. On the contrary, market structure in the relevant market, though not an absolute talisman, is an indicia of monopoly power. *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945). It is uncontroverted that more than ten years after the *Carterfone* decision, SNET still maintains over 90% of the relevant market, whether measured by number of systems or by revenue.

The jury could properly consider these figures on the question of monopoly power.

Defendants' argument is further undercut by the charge to the jury which stated that "if a company has an increasing share of the revenue of the relevant market from one year to the next over a period of years, that has been seen as evidence of monopoly power, while a declining share has been seen as evidence of the lack of monopoly power. In this connection, you may consider that SNET in our situation started with 100% of the market share as of 1968."

equipment far inferior to that offered by Northeastern and others, and the inability of a high percentage of interconnect companies to survive in the Connecticut market, amply supported the jury's findings that SNET had the power to control prices *and* to exclude competition.

As the case was put to the jury, the overriding issue common to each of Northeastern's claims was whether defendants had engaged in anticompetitive or predatory conduct. Because the bulk of the evidence related to the conduct issue, the primary thrust of defendants' motion is directed to the sufficiency of the evidence relating to each of the six areas of conduct. Thus, it is to this second element of monopolization—acquisition or maintenance of monopoly power by anticompetitive or predatory means—that the Court now turns.

In *Berkey v. Kodak, supra,* the court noted that "a monopolist is permitted, and indeed encouraged, by § 2 to compete aggressively on the merits, . . . .." *Id.* at 281. On the other hand, the court stated that a firm with monopoly power "must refrain at all times from conduct directed at smothering competition." *Id.* at 275. Against these standards, the jury was instructed to analyze whether the various acts or practices alleged by Northeastern were merely instances of aggressive competition, which is encouraged, or were instances of anticompetitive or predatory conduct, which is prohibited.

Defendants do not contest the fact that some evidence was offered on each of the six areas of conduct. They argue instead that the evidence does not satisfy the applicable standards for determining whether an act or practice is anticompetitive or predatory. The Court finds, however, that Northeastern has offered sufficient evidence on each of the six areas of conduct from which the jury could reach the verdicts it did. Because of the importance of the pricing and PCA claims, the Court will examine the evidence offered on each in some detail.

### 1. *Pricing.*

The heart of Northeastern's case is its pricing claims. The pricing claims have two aspects: first, that SNET's rates for terminal equipment were predatory; and second, that two–tier pricing was anticompetitive.

As they did at the time of trial, defendants again urge this Court to adopt a marginal or incremental cost standard for determining whether they have engaged in predatory pricing. They argue that if a price recovers the marginal or incremental costs of a product or service—those costs which vary with the introduction or volume of that product or service—it is not predatory. This is a standard which has been adopted, with various modifications, by a number of courts and commentators. *E. g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir. 1980); *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727 (9th Cir. 1979); *Pacific Engineering & Production Co. of Nevada v. Kerr–McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977); Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975).

Absent guidance from the Second Circuit, this Court again declines to adopt that standard on the particular circumstances of this case. Instead, defendants' pricing conduct will be viewed against a pricing floor of fully distributed cost. *See* Areeda & Turner, *Antitrust Law* ¶ 714, at 159–64 (1978); Baumol & Walton, *Full Costing, Competition and Regulatory Practice,* 82 Yale L.J. 639 (1973). Fully distributed cost combines the marginal or incremental cost of supplying a particular good or service with some portion of the unattributable costs (i. e., indirect costs). Such a standard is particularly appropriate for a firm like SNET which sits astride noncompetitive and competitive markets and has the potential to "undermine competition by supporting artificially low prices in the terminal–equipment market with revenues from intrastate

monopoly services." Note, *Competition in the Telephone Equipment Industry*, 86 Yale L.J. 538, 550 (1977).

One of the indicia of predatory pricing posited by Areeda & Turner is whether a firm has engaged in the "deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition." Areeda & Turner, 88 Harv.L.Rev. at 698. Although such a test may be appropriate for the normal industrial firm which is in a competitive situation in all sectors of its business, it is not appropriate for an entity like SNET which can support artificially low prices in the terminal equipment market with revenues from monopoly services. To permit SNET to allocate all or a disproportionate percentage of its unattributable costs to the noncompetitive sector of its business—which defendants urge this Court to do under the guise of long–run incremental analysis ("LRIA")–is to give defendants an improper pricing advantage over Northeastern and other single market competitors who must allocate all costs directly to their terminal equipment rates. A fully distributed cost standard, on the other hand, would require that the rates for SNET's competitive products and services reflect some portion of its unattributable costs, thus substantially curtailing potential subsidization. Under the particular circumstances of this case, a fully distributed cost pricing floor is the proper standard against which to measure defendants' pricing practices.

The evidence submitted to the jury on the predatory pricing issue can be divided into two segments: the evidence concerning KTS rates and the evidence relating to PBX rates.

Plaintiff introduced no direct cost evidence at all as to 1A key system rates. Instead, it relied solely on the claim that such rates remained constant between 1972 and 1977, a period of sharp inflation. Similarly, with respect to ComKey rates, plaintiff relied simply on the evidence that these rates were not raised during the period from 1974 to 1977. In conjunction with this evidence, plaintiff offered evidence that SNET's costs on a company–wide basis increased about 60% during the relevant period. Finally, plaintiff points to a statement in a confidential report concerning competition in the interconnect business prepared by the SNET marketing department in February, 1973 that the April, 1972 general rate increase made SNET's rates for key telephone systems more competitive.

This evidence cannot support the inference that SNET's KTS rates were below cost and thus predatory. Even discarding all the evidence offered by defendants concerning the setting of these rates, such as the use of an inflation factor, the jury could not have found that the rates were predatory. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 461 F.Supp. 410, 417 (N.D.Cal.1978); *Murphy Tugboat Co. v. Crowley*, 454 F.Supp. 847, 854 n.6 (N.D.Cal.1978).

The evidence on whether SNET's PBX rates, principally its rates on Dimension 100 and 400, were predatory was somewhat more substantial. First, SNET concedes that its rates were based on an incremental pricing standard. Under this methodology, SNET, in setting its rates, took into account only the incremental costs attributable to Dimension and affected by Dimension over a five–year period; it did not attribute any portion of its direct or common costs to the Dimension rates.

Second, the Dimension 100/400 tracking report prepared by SNET in October, 1978 to measure Dimension performance, showed a small negative contribution for 1977, the first year of the Dimension offering. Third, in December, 1975 SNET proposed certain rate levels for its Dimension offerings based on forecasts prepared by SNET rate and marketing personnel. These proposed rates were submitted to officials at AT&T who expressed concern that the rates were so high as to be out of line with AT&T recommendations. After consultations with these officials, SNET prepared a revised forecast, the effect of which was to reduce

the burden[11] to be borne by Dimension 100 and 400, and thus reduce the rates for these offerings.

Finally, there is the testimony of Dr. John W. Wilson, Northeastern's expert witness, who stated that based on the Dimension 100/400 tracking report and other studies and cost data, he found the rates for the Dimension offerings to be noncompensatory, that is, less than cost. In this regard, Wilson testified that based on his own analysis and calculations, Dimension 100 was underpriced by 46.73% and Dimension 400 by 9.65%.

■ The one element lacking from all this evidence is a direct comparison of SNET's rates for its Dimension 100 and 400 PBXs and its fully distributed cost for those products. Although Dr. Wilson made a number of conclusory statements concerning underpricing, he did not offer direct evidence as to SNET's costs in comparison to its rates. In short, the question is whether in the absence of direct evidence demonstrating pricing below fully distributed cost, a jury may nevertheless find that the pricing is predatory. This Court holds that it may. In the present case, the evidence presented on pricing, when taken as a whole, is sufficient to support the jury's verdict that SNET's rates for its Dimension 100 and 400 offerings were below cost, and thus, predatory.[12]

### 2. Two–tier Pricing

Telephone service has traditionally been offered on a service basis under which the customer pays a basic monthly charge and continues to pay that charge as long as the service continues. In apparent response to the variety of payment plans offered by terminal equipment competitors, SNET decided that it needed to adopt some payment plan as an alternative to its monthly "pay forever" plan. This led to the filing of the customized or two–tier payment option tariff.

This payment option permits business customers in Connecticut to pay for service in one of two ways. First, they can elect a month–to–month payment plan under which they are obligated to pay a regular monthly rate for as long as they keep the service. This plan is similar to the way in which SNET's subscribers pay for their basic business or residential exchange telephone service. The second payment option is the two–tier payment plan. Under this arrangement, the customer makes monthly payments over a term selected by it, which could be from zero to twelve years, depending on the type of equipment involved. These payments are designed to permit SNET to recover its capital outlay. Since this rate is intended to recover SNET's one–time costs, SNET agrees not to request any increases in it for existing customers. SNET recovers the ongoing costs of providing the service, such as repairs and maintenance, by a second monthly charge which continues for as long as the subscriber keeps the service. As these ongoing costs may change, SNET may seek increases in the variable rate. If the subscriber cancels his service before the end of the economic life of the equipment, he recovers a credit for its reuse value to SNET. If cancellation is before the term rate has been fully paid, this credit is reduced by the present value of the unpaid portion of that rate.

Northeastern cannot and does not contend that the two–tier payment plan is *per se* illegal. It argues instead that SNET, on its own and in conjunction with AT&T, introduced and implemented the payment option in a manner which was anticompetitive. That is, Northeastern complains, and the jury found, that SNET adopted the two–tier plan primarily to impede competition rather than as a reasonable business

---

11. That is, the additional costs that SNET would incur by introducing Dimension, but which are not attributable to the product itself.

12. The fact that this Court has determined that SNET's KTS rates were not predatory does not undermine the jury's response to Question 3(a).

It is clear from the evidence that the KTS rates did not form the basis for the jury's verdict in Question 3(a), and the Court is "fairly convinced that the jury proceeded on the only sound ground[s]." *Morrissey v. National Maritime Union*, 544 F.2d 19, 27 (2d Cir. 1976).

practice to better serve its customers' needs. The evidence on this claim was offered principally through two witnesses: Alfred W. VanSinderen, President of SNET from 1967 to the present, and Abbott H. Davis, Jr., Vice President of Marketing for SNET from 1973–79.

SNET's major losses to competition in the terminal equipment market during the period from 1971–74 were in the KTS area. Competitors were not a significant factor in the PBX market at that time. In response to the inroads into the KTS market, SNET, in 1974, tariffed ComKey 718 and 1434 and offered them solely under the two–tier option. SNET did not at this time offer the two–tier option with its other KTS offerings (such as the 1A key system) or its PBX offerings.

In 1975 the DPUC granted SNET a general rate increase, the effect of which was to raise significantly the price for PBX equipment. The substantial price advantage that SNET maintained in the PBX market prior to 1975 was lost in the general rate increase, and at that point SNET decided to offer the two–tier option to its PBX customers as well as its KTS customers. In conjunction with the new PBX sales, SNET also approached its existing PBX customers on the conventional monthly tariff for the purpose of encouraging them to convert to the two–tier option.

Finally, in 1977 when it became apparent to defendants that the FCC's registration program was imminent, SNET tariffed a new small key set, the ComKey 416, and offered it pursuant to the conventional and two–tier payment plans. Prior to 1977 there had been little competitive activity in the small key market, because the PCA requirement had made entry into this market economically unfeasible.

Northeastern argues that this evidence demonstrates that SNET's primary purpose in introducing the two–tier plan was its desire to stifle competition, rather than its desire to serve customer needs. SNET admits that it adopted the two–tier payment option to fight competition, but argues that the payment option was an ordinary marketing practice similar to those practices utilized by competitors and that the antitrust laws do not proscribe lawful conduct which is simply a response to competitive pressures.

In *Berkey Photo, Inc. v. Eastman Kodak Co., supra,* Judge Kaufman stated that, with respect to section 2, two basic principles are clear: first, the "mere possession of monopoly power does not *ipso facto* condemn a market participant; " and second, "to avoid the proscriptions of § 2, the firm must refrain at all times from conduct directed at smothering competition." *Id.* at 275. Implicit in this second principle is a recognition of the fact that conduct which when viewed in a vacuum would appear proper, may be found to be anticompetitive where such conduct is directed at preventing or impeding competition. "[M]any anticompetitive actions are possible or effective only if taken by a firm that dominates its smaller rivals. . . . Such conduct is illegal when taken by a monopolist because it tends to destroy competition, although in the hands of a smaller market participant it might be considered harmless, or even 'honestly industrial.' " *Id.* at 274–75 (citations omitted).

With this in mind, the Court cannot say that the jury's verdict on this aspect of the pricing issue is in error. The evidence is clear that SNET implemented the two–tier payment option solely as a response to the entry of competition in the terminal equipment market. In addition, it is evident that SNET made a concerted effort to have its customers, both new and existing, adopt the two–tier option over the monthly payment option. It takes no great leap of faith to infer from this conduct that SNET was attempting to insulate its customers from competition through the use of the payment option. Although SNET forcefully argues that the payment plan is no different from the variety of payment plans offered by competitors, *Berkey* is clear that "many anticompetitive actions are possible or effective only if taken by a firm that dominates its smaller rivals." *Id.* In this case, there is sufficient evidence in the record

upon which the jury could find that SNET's use of the two–tier payment plan was for the purpose of impermissibly tightening its hold on the relevant market.

### 3. Protective Coupler

In this case, unlike many of the other interconnect cases, see, e. g., fn. 8, supra, Northeastern specifically did not attack the PCA tariff itself. Rather, it limited itself to specific allegations concerning the manner in which the PCAs were designed.[13] *Northeastern* at 255.

It is not disputed that the primary purpose of the PCA was to prevent certain types of harm to the network, such as cross–talk and longitudinal imbalance. Yet, Northeastern offered a good deal of testimony from its own witnesses and from defendants' witnesses that the PCAs were overdesigned, making them more expensive than necessary and designed in a way to require modification of non–Bell equipment or to require additional equipment and an external power source on the customer's premises.

The evidence concerning the design of the PCA centered principally on two alleged deficiencies. The first concerned the fact that the PCA required an independent power source and could not operate off line power, the most significant result of this being that a customer would lose phone service in the event of a power outage. Defendants' witnesses admitted that the PCA could have been designed to operate without external power. The second deficiency concerned the fact that certain PCAs had multiple leads which were not compatible with the two–lead terminal equipment provided by Northeastern and others, thus requiring the rewiring of the terminal equipment. Defendants' witnesses again admitted that the PCAs could have been designed without the multi–lead feature.

In fact, SNET ultimately did abandon the multi–lead design in favor of the two–lead design. In addition to these two principal charges, there was also evidence concerning loss of signal power, lack of transparency, and redundancy caused by the use of the PCA.

Perhaps the most significant evidence relating to the PCAs was the NAS study referred to previously in Section I. The study listed among its conclusions a number of criticisms of the PCA as it was then designed. These criticisms included, *inter alia*, dependence on an external power source, the redundancy between the functions of the PCAs and those of user–provided equipment, and the lack of transparency. Yet, knowing this in 1970, defendants, as their own witnesses admitted, did not materially change the design of the PCAs from then until 1978 when the registration program commenced. Although defendants put forth a good deal of persuasive evidence concerning the reasonableness of the PCA design, the jury, taking the evidence as a whole, could find that the PCAs were not reasonably designed but were designed for the purpose of impeding competition.

### B. Attempted Monopolization

Defendants next challenge the jury's verdict finding SNET guilty of attempted monopolization on the ground that Northeastern failed to show specific intent. *Times–Picayune Publishing Co. v. United States*, 345 U.S. 594, 626, 73 S.Ct. 872, 889, 97 L.Ed. 1277 (1953). They argue that there is not sufficient evidence to support an inference of specific intent.[14]

On the contrary, there is overwhelming evidence upon which the jury could base its verdict on this issue. The record contains substantial direct testimony by officials of defendants, including the President of SNET, VanSinderen, that they were op-

---

**13.** Northeastern also contended that there were problems concerning supply and service of PCAs; however, those issues did not go to the jury.

**14.** Although defendants do not raise the issue, the Court finds that the uncontroverted evidence of SNET's 95% plus share of the interconnect market is sufficient to establish "dangerous probability of success." *Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 846 (9th Cir. 1980).

posed to competition in the interconnect market and that they intended to fight it. Similarly, there is documentary evidence which plainly indicates defendants' concern with the inroads of competition and their efforts to retard it. Based on this, the jury could have found specific intent on the part of SNET to monopolize the relevant market. Moreover, the jury was clearly entitled to infer the existence of specific intent from the evidence of SNET's market power and its findings that SNET had engaged in predatory and anticompetitive conduct. *See Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830, 845–46 (9th Cir. 1980); *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 668–70 (9th Cir. 1980).

### C. *Conspiracy to Monopolize and to Restrain Trade*

Defendants challenge the jury's verdict on Northeastern's conspiracy claims on the ground that there is insufficient evidence to support the conspiracy finding. They argue that the evidence adduced at trial simply reveals cooperation and collaboration among affiliated noncompeting companies, and that such conduct does not run afoul of the antitrust laws. *Beckman v. Walter Kidde & Co.*, 316 F.Supp. 1321 (E.D.N.Y. 1970), *aff'd*, 451 F.2d 593 (2d Cir. 1971), *cert. denied*, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

■ It is well established that because a conspiracy is rarely susceptible of direct proof, a party may properly rely upon circumstantial evidence from which a conspiracy violation may be inferred. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Blair Foods, Inc. v. Ranchers Cotton Oil, supra*, at 671; *Ambook Enterprises v. Time Inc.*, 612 F.2d 604, 613–14 (2d Cir. 1979). In the present case, the jury was presented with circumstantial evidence upon which it could reasonably infer the existence of a conspiracy among the defendants. The clearest example of such evidence concerned the resetting of rate levels for the Dimension offering, previously discussed. The testimony of two employees of defendants, Lit-tle and Goldstein, showed that AT&T played a significant part in the decision to lower the proposed rate levels established by SNET personnel for the Dimension series.

Furthermore, it is virtually undisputed that AT&T, Western Electric, and SNET jointly participated in planning and implementing many of the areas of conduct that the jury found to be anticompetitive or predatory. For example, the LRIA pricing methodology, the two–tier payment plan, and the PCA were all concepts or products developed by AT&T and adopted by the operating companies such as SNET. Similarly, the testimony of Wilson concerning the Western Electric pricing on PBX and KTS equipment was further evidence from which the jury could infer a conspiracy among the defendants. In sum, the evidence is sufficient to support the jury's finding that defendants engaged in a conspiracy to monopolize and restrain trade in the relevant market.

### D. *Antitrust Injury*

■ A showing of injury to business is a prerequisite to standing to sue for an antitrust violation. *Brunswick Corp. v. Pueblo Bowl–O–Mat Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Defendants argue that Northeastern has not established the fact of injury and that, even if it has, the injury is not cognizable under the antitrust laws.

As defendants correctly point out, fact of injury encompasses two aspects. Northeastern must show that it has actually been injured and that its injury was of an antitrust nature, causally related to defendants' antitrust violations. With respect to the first element, "[the] burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by . . . proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9, 89 S.Ct. 1562, 1571 n.9, 23 L.Ed.2d 129 (1969). With respect to the issue of causation,

Northeastern must prove that the injury it incurred is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc., supra.* Here, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury; . . ." *Zenith Radio Corp. v. Hazeltine Research Corp., supra.*

The record is replete with examples of lost sales or situations from which the jury could infer lost sales as a result of defendants' anticompetitive and predatory conduct. The most striking testimony in this regard was that of Thomas A. Patsiga and Peter H. Oliver, officers of Northeastern, who detailed specific situations in which Northeastern lost sales or were prevented from approaching a particular customer because of the actions of defendants. Moreover, the jury could plainly infer antitrust injury from its finding that SNET had engaged in predatory pricing.

Defendants raise two objections to the sufficiency of the evidence on the injury issue. First, they argue that all the testimony on injury was offered by officers of Northeastern and that as a matter of law, this evidence is insufficient. *See, e. g., H & B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 247 (5th Cir. 1978), *citing Yoder Brothers, Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1371 & n.25 (5th Cir. 1976), *cert. denied,* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977). Although such a proposition may be true in a situation where the relevant testimony consists of conclusory self–serving statements, that is not the situation in the present case. In this case, the testimony of Patsiga and Oliver, substantially unrebutted, consisted of numerous detailed situations where sales were lost or were not able to be made due to defendants' activities. For example,

Patsiga testified that the two–tier pricing plan foreclosed Northeastern from making a number of potential sales. He testified further to the cutover problem, the effect of SNET's advertising and marketing programs, and to the preannouncement of untariffed offerings, in each case relating them to specific customers or potential customers. Similarly, Oliver testified to the inability of Northeastern to break into the small key telephone market because of the expensive design of the PCA.[15]

■ Defendants' second objection to the jury's verdict on injury relates to the evidence concerning Northeastern's "spectacular" growth. Defendants argue, apparently, that because Northeastern has managed to be successful against a great number of odds, it cannot claim to have been injured by defendants' conduct. The anomaly in this position is clear. Under this theory, the only person having standing to sue under the antitrust laws would be one who had been driven out of business. Section 4 of the Clayton Act contains no such qualification and defendants have cited no authority to support such an interpretation. Accordingly, the Court finds that the evidence put forth by Northeastern is sufficient to demonstrate that it has been injured in its business and that that injury flowed directly from defendants' anticompetitive and predatory conduct.

## III

### DAMAGES

■ Northeastern's proof of damages requires extensive review on the instant motion, in light of the Second Circuit's "reasonable foundation" test. "Although damages may be ascertained from a jury's just and reasonable inference from proof of the wrongful act, its tendency to injure plaintiff's business, and evidence of decline in profits . . . there must neverthe-

---

15. Defendants argue that any injury or damage caused by the coupler design was not antitrust injury. However, this is one of the clearest examples of conduct which had "the effect of significantly impairing the ability of rivals to compete." Areeda & Turner, *Antitrust Law*

" 626, at 80 (1978). The use of an overdesigned and overly expensive PCA in the small key market effectively foreclosed competition, since in that market, the monthly charge for the PCA comprised a significant portion of the overall cost of small key terminal equipment.

less be a reasonable foundation from which a jury can calculate the amount of damages." *Yentsch v. Texaco, Inc.,* —— F.2d ——, at ——, —— n.19 (2d Cir. 1980), slip op. at 2857, 2882 n.19 (May 12, 1980) (citations omitted). The question thus presented is whether Northeastern supplied a rational basis from which the jury could reach the verdict it did. *See Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906 (2d Cir.), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *SCM Corp. v. Xerox Corp.,* 463 F.Supp. 983, 1019 (D.Conn.1978), *remanded on other grounds,* 599 F.2d 32 (2d Cir. 1979).

Northeastern's proof of damages was offered through three witnesses: Dr. John W. Wilson, an expert who also testified during the liability portion of the trial; and Gunther Dannheim and Bruce S. Kuryla, officers of Northeastern, who laid the foundation for Wilson's testimony and who likewise had testified previously during the liability phase of the trial. The evidence on damages was reasonably straightforward. Wilson testified first that, based on his studies and calculations, interconnect companies generally would have achieved a one–third share of the relevant market, absent defendants' anticompetitive conduct. From this he then calculated Northeastern's share of the one–third, based on its present share of the interconnect market. Having projected Northeastern's market share, Wilson then computed Northeastern's total lost sales in the PBX and KTS markets.[16] Based on the lost sales figures, Wilson computed lost sales revenues and arrived at a figure of $19,393,500.[17] Applying a profit factor of 18.98%, Wilson concluded that Northeastern's total lost profit attributable to lost sales from 1972 to 1979 was $3,680,886. Wilson also calculated Northeastern's lost ongoing revenues for the same period

as $6,179,976,[18] and again applying an 18.98% profit factor, Wilson concluded that Northeastern's total lost profit attributable to lost ongoing revenues from 1972 to 1979 was $1,172,959.

Finally, Wilson computed Northeastern's loss of going concern value. He did this by combining Northeastern's total lost profit in 1979 attributable to lost sales revenue and lost ongoing revenue ($1,042,894), reducing that figure by 50% to account for estimated taxes, and multiplying the after–tax figure ($521,477) by a factor of six to arrive at a total loss of going concern value of $3,128,682.

Defendants attack Northeastern's proof of damages on three principal grounds. First, defendants argue that Northeastern failed to prove the amount of damages flowing from each separate area of anticompetitive conduct. Second, defendants claim that the damages calculations and conclusions were not based on adequate factual data. Third, defendants contend that Northeastern was not entitled to recover for injury to going concern value.

■ With respect to the first argument, the Court recognizes that the general rule in an antitrust case is that a plaintiff must prove the amount of damages flowing from each separate area of anticompetitive conduct. *Van Dyk Research Corp. v. Xerox Corp.,* 478 F.Supp. 1268, 1316 (D.N.J.1979); *ILC Peripherals Leasing Corp. v. International Business Machines Corp.,* 458 F.Supp. 423, 434 (N.D.Cal.1978). *Cf. Berkey Photo, Inc. v. Eastman Kodak Co., supra; SCM Corp. v. Xerox Corp., supra.* In the present case, Northeastern did not attempt to quantify the amount of damages flowing from each of the specific anticompetitive practices forming the basis for the jury's ver-

**16.** The figures were as follows: PBXs–211; KTS (3 lines & up)–468; small KTS–305. With respect to the small key calculation, the actual sales plus the projected sales were less than Northeastern's total estimated market share because of preregistration sales losses due to the PCA requirement which was not an issue in this suit.

**17.** Again, the breakdown is as follows: PBXs–$15,192,000; KTS (3 lines & up)–$3,774,000; small KTS–$457,500.

**18.** This figure was based on a projected number of total lost stations multiplied by $54 per station, an estimated figure as to the amount of revenue each lost station would provide on a yearly basis.

dicts in the liability phase. Indeed, Wilson admitted that he did not attempt to determine the individual impact of any of the specific anticompetitive or predatory practices.

Nevertheless, this case presents a number of unique factors, not present in *Van Dyk, ILC Peripherals, Berkey*, and *SCM*, which dictate against finding that Northeastern's failure to allocate damages among the various anticompetitive acts is fatally defective to the proof of damages. What is involved in this action is a single, well–defined, and stipulated relevant market: business terminal equipment in Connecticut. The various acts and practices which the jury found to be anticompetitive at the liability phase of the trial were so closely interrelated as to preclude meaningful individualized consideration of damages. Under these circumstances, it would have required greater speculation on the part of the jury to derive the specific amount of damages attributable to each anticompetitive or predatory act than it would to arrive at a single figure attributable to defendants' overall unlawful conduct in the relevant market.

■ Relying primarily on *ILC Peripherals* and *Van Dyk*, defendants argue that Northeastern's proof of damages fails to separate the effect of lawful from unlawful competition. Although those cases are distinguishable from the present case in many respects, the most significant fact is that, unlike the present case, neither *ILC Peripherals* nor *Van Dyk* were bifurcated proceedings. In those cases, if the damages had not been tied to the specific claims of anticompetitive conduct, the jury or the court would not have had a rational basis on which to correlate the damages to the particular conduct found to be predatory or anticompetitive. In the damages phase of the present proceedings, Wilson specifically stated that he was basing his damage calcu-

lations on the jury's verdicts on the liability counts. Moreover, the Court in its charge to the jury emphasized the fact that damages could only be based on that conduct which the jury had previously found unlawful. Northeastern's failure to put forth evidence with respect to each anticompetitive or predatory act did not deprive the jury of a rational basis on which to render its damage awards.[19] *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., supra.*

Defendants also assert that Northeastern's proof of damages was not based on adequate factual data. Specifically, defendants attack Wilson's one–third market share projection and his incremental profit rate calculation.

■ As stated previously, the Supreme Court has not required antitrust plaintiffs to carry a heavy burden with respect to a showing of the amount of damages. *Zenith Radio Corp. v. Hazeltine Research, Inc., supra*, 395 U.S. at 123–24, 89 S.Ct. at 1576–1577; *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 254, 66 S.Ct. 574, 575, 90 L.Ed. 652 (1946). However, there must be a reasonable foundation from which a jury can calculate such an amount. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1352–53 (3d Cir. 1975); *Herman Schwabe, Inc. v. United Shoe Machinery Corp., supra*, at 912–13.

With respect to the one–third market share projection, Wilson relied primarily on three things: a 1973 speech made by Charles Brown,[20] then president of Illinois Bell and now Chairman of AT&T; data concerning other industries; and cross–elasticity studies of two SNET products.

In his speech, Brown projected that by 1980 on a nationwide basis the Bell System would lose one–third to two–thirds of the terminal equipment market to interconnect companies. Based primarily on the Brown

---

**19.** The fact that this Court has determined that SNET's KTS rates were not predatory does not change this result. As is clear from the evidence, a lion's share, if not all of the damage suffered by Northeastern in the KTS market was attributable to the two–tier payment option and the design of the coupler.

**20.** The term "speech" is slightly misleading. The speech was a technical presentation delivered at a Bell System Presidents' Conference.

speech, Wilson projected that interconnect companies in the relevant market would have achieved one–third of that market. This evidence standing alone would plainly not provide a sufficient basis for Northeastern's proof of damages. Yet, when coupled with Wilson's testimony concerning other industries in which similar monopoly situations existed and his testimony concerning cross–elasticity data from SNET with which he cross–checked his one–third projection, the evidence provided the jury with a rational basis on which to base its verdicts.

With respect to the 18.98% incremental profit rate calculation, defendants argue that the figure is so out of line with Northeastern's actual performance as to be worthless.[21] Defendants' argument fails on several points. First, to the extent that defendants complain that the 18.98% figure is completely out of line with Northeastern's actual performance, they overlook the fact that Northeastern's actual results were not a valid comparison, because Northeastern was operating in a market where a monopolist was engaging in anticompetitive and predatory conduct. Second, defendants confuse incremental profit rate and net profit. It is undisputed that Northeastern's actual net profits from 1972 through 1979 averaged less than 5% and that its highest net profit year reached only 14%. Moreover, the 18.98% figure is not a calculation of net profits. Rather, the figure represents the profit rate on lost sales. As Northeastern correctly notes, net profit on the total of actual sales and projected lost sales would be considerably less than 18.98%. Finally, to the extent defendants attack Wilson's accounting expertise or his methodology for calculating incremental profit rate, these are matters better left to cross–examination and rebuttal. In fact, defendants did extensively cross–examine Wilson and did produce their own expert witness, Mr. Richard Crane, a CPA, who challenged many of the premises and assumptions underlying Wilson's methodolo-

gy. Whether the 18.98% profit rate provided a valid basis for the determination of damages was a question properly left to the jury, and this Court will not disturb the verdict on that ground.

■ Lastly, defendants contend that Northeastern was impermissibly awarded damages for both past lost profits and injury to going concern, arguing that the awards overlap. However, defendants have made no showing that the awards do in fact result in duplication. Although there is a scarcity of authority on this precise point, the Court finds that an antitrust plaintiff may recover both for past lost profits and for decrease in going concern value. *Cf. Atlantic City Electric Co. v. General Electric Co.*, 226 F.Supp. 59, 61 (S.D.N.Y.), *appeal dismissed*, 337 F.2d 844 (2d Cir. 1964).

■ The motion for judgment n.o.v. is therefore denied in all respects.

## IV

## NEW TRIAL

In the alternative, defendants have moved for a new trial on three grounds: (1) that the verdict is against the weight of the evidence; (2) that the Court committed errors in the charge to the jury; and (3) that jury prejudice existed because of an unfair juror selection process.

The first ground need not long detain the Court. The evidentiary support for the jury's verdict was discussed in Section II, *supra*, and will not be repeated here. Even were this Court to "reweigh" the evidence and make its own independent determination, as defendants urge, *see* 11 Wright & Miller, Federal Practice and Procedure § 2806, at 43–45, the Court finds that the verdicts reached by the jury are not contrary to the weight of the evidence. Defendants' argument that the Court should order a remittitur, *see Berkey Photo, Inc. v. Eastman Kodak Co., supra,* at 305, is also without merit. As stated previously in Sec-

---

**21.** The incremental profit rate was calculated by first computing the increase in sales ($1,345,776) and the increase in income ($255,-

419) from 1978 to 1979 and then dividing the sales figure into the income figure.

tion III, *supra*, Northeastern's evidence on damages provided a rational basis from which the jury could reach the verdicts it did. Having said this, the Court cannot now say that these damages are so excessive as to warrant remittitur.

Defendants contend that errors in the charge to the jury after the liability phase of the trial prevented a proper verdict. The substance of defendants' objections has been ruled on by this Court previously on the record and in other contexts in this opinion. No purpose would be served by reexamining any of these rulings except the Court's charge on the role of regulation in assessing the reasonableness of defendants' conduct.

During the pendency of defendants' motion for judgment n.o.v., the Fifth Circuit Court of Appeals handed down its decision in *Mid–Texas Communications Systems, Inc. v. American Telephone & Telegraph Co.*, 615 F.2d 1372 (5th Cir. 1980), which involved an action by an independent telephone company against certain members of the Bell System. Plaintiff, a corporation formed for the purpose of providing telephone service within a residential development outside Houston, Texas, based its suit primarily on the refusal of Southwestern Bell to provide toll interconnection of the proposed telephone facility with the Bell System. The Fifth Circuit reversed a jury treble damage award and remanded the case to the district court for a new trial. Although the facts of that case are distinguishable (it involved interconnection between carriers, instead of between a carrier's lines and equipment provided by the customer) defendants contend that the Fifth Circuit's discussion of the importance of regulation in the context of jury instructions is relevant. Defendants argue that this Court improperly downgraded the role of regulation played by the FCC and the DPUC.

*Mid–Texas* is distinguishable from the present case on two significant grounds. In this case the Court, unlike the district court in *Mid–Texas*, instructed the jury on five separate occasions that the defendants were regulated by the FCC and the DPUC, and that the jury could consider such regulation in assessing the reasonableness of defendants' conduct. In *Mid–Texas*, the district court in its charge to the jury did not once discuss the role of regulation.

■ *Mid–Texas* is distinguishable on a second and more fundamental ground. The Fifth Circuit in *Mid–Texas* first found that AT&T and Southwestern Bell did not enjoy a general implied immunity from the antitrust laws based on state and federal regulation over interconnection and related matters. Nevertheless, the court then stated that "if [Southwestern Bell's] purpose in refusing interconnection was to vindicate the public interest, then the refusal, despite its obvious anticompetitive effect, would have been proper and entitled to protection from antitrust scrutiny." Does this decision mean that a specific course of conduct approved by a regulatory body, as being conduct in the "public interest," falls outside the proscription of the antitrust laws? This Court specifically rejected such an argument throughout the trial and in charging the jury. Such an assertion is completely at odds with finding no implied antitrust immunity for defendants' activities, and this Court continues to reject it.

In the present case, it is undisputed that much of the conduct for which defendants were found liable was conduct specifically approved, or at least not disapproved, by either the FCC or the DPUC. Under the standard apparently set forth in *Mid–Texas*, this same conduct, because it passes regulatory muster, would be immune from the operation of the antitrust laws. This Court respectfully disagrees with that position and affirms its earlier ruling on the record concerning the role of regulation in assessing defendants' conduct.

■ Defendants' final argument on their alternative motion for a new trial is that the jury was not properly representative because of errors in the selection process. Specifically, defendants claim that their right to a trial by a jury drawn "from a fair cross section of the community," 28 U.S.C. § 1861, was denied by the Court's

"too liberal granting" of hardship excuses for jurors with an advanced education or a responsible business position. Defendants do not contest the composition of the initial panel.

28 U.S.C. § 1866(c) provides in relevant part that "no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: *Provided*, That any person summoned for jury service may be (1) excused by the court upon a showing of undue hardship or extreme inconvenience." "[U]ndue hardship or extreme inconvenience" is defined in section 1869(j) and includes such things as great distance, grave illness in the family, and emergencies which outweigh "the obligation to serve as a juror." In addition, "in situations where it is anticipated that a trial . . . may require more than thirty days of service, the court may consider as a further basis for temporary excuse, severe economic hardship to an employer which would result from the absence of a key employee during the period of such service."

In the present case, twelve jurors were excused pursuant to 28 U.S.C. § 1866(c) on the basis of "undue hardship or extreme inconvenience." Of these twelve, five were excused pursuant to that portion of section 1869(j) concerning economic hardship to an employer. Defendants point out that "a number of those excused had substantial education beyond high school and responsible business positions." This is not disputed. Indeed, of the twelve of the venire excluded, only one did not finish high school. However, of the twenty–one jurors who remained on the panel after exclusions for cause, from which the petit jury was ultimately chosen, sixteen had high school or post–high school educations. In addition, a number had what defendants broadly term "responsible" business positions. Moreover, there is little basis for concluding that "the well–educated and those with responsible business positions" is a cognizable group whose exclusion would violate the fair cross–section requirement of section 1861. In support of their position, defendants cite *Thiel v. Southern Pacific Co.*, 328

U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). In *Thiel*, the Court held that the deliberate exclusion of persons of a particular economic or social station did violence to the "democratic nature of the jury system." *Id.* at 223, 66 S.Ct. at 987. In the present case, the Court clearly did not deliberately exclude persons of a particular economic or social status. What the Court did do was to exclude those persons from the panel who demonstrated that a six–to–eight week trial would work an undue hardship or extreme inconvenience on themselves or their employers. The fact that in a particular instance hardship or inconvenience may have been occasioned by advanced education or a responsible business position is immaterial.

Defendants' objection to the exclusion of potential jurors who owned AT&T or SNET stock is without merit. *See Chestnut v. Ford Motor Co.*, 445 F.2d 967, 971 (4th Cir. 1971).

Defendants' alternative motion for a new trial is denied.

## V

## ATTORNEYS' FEES

 The procedure to be followed on considering a request for attorneys' fees in a private antitrust action is the lodestar approach, which was developed by the Court of Appeals for the Third Circuit in *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3d Cir. 1973) [hereinafter "*Lindy I*"], and *Lindy Brothers Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102 (3d Cir. 1976) (en banc) [hereinafter "*Lindy II*"], and which was subsequently adopted by the Court of Appeals for the Second Circuit, *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) [hereinafter "*Grinnell I*"], and *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir. 1977) [hereinafter "*Grinnell II*"]. Although *Lindy* and *Grinnell* were class actions, the district courts in this circuit have held that the lodestar approach governs an

award of attorneys' fees in ordinary private antitrust actions as well. *E. g., Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.*, 480 F.Supp. 1195 (S.D.N.Y.1979), aff'd, 622 F.2d 1106 (2d Cir. 1980); *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054 (S.D.N.Y.1977), *aff'd mem.*, 578 F.2d 1368 (2d Cir. 1978); *FLM Collision Parts, Inc. v. Ford Motor Co.*, 411 F.Supp. 627 (S.D.N.Y.), *rev'd on other grounds*, 543 F.2d 1019 (2d Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977).

The lodestar approach is a two–step process. First, the court computes the lodestar by multiplying the attorneys' hours by reasonable hourly rates. In this case, the parties have stipulated to a lodestar of $498,542.25. Second, where plaintiff's counsel is paid on a contingent fee basis, the court may adjust the lodestar to account for risk and quality factors.

 Adjustments to the lodestar are not granted as a matter of course. Since the lodestar represents a reasonable hourly rate for a reasonable number of hours, an award of the lodestar figure alone fulfills the Clayton Act's provision for "a reasonable attorney's fee." 15 U.S.C. § 15.

 The court in *Lindy II* outlined in detail the risk and quality factors that may be considered in adjusting a lodestar figure. With respect to the risk aspect, there are three principal factors which the court may consider to determine whether an increase in the lodestar is warranted: (1) plaintiff's burden; (2) risks assumed by plaintiff's counsel; and (3) delay in receiving payment.

The court may increase the lodestar where plaintiff's counsel has managed a legally and factually complex case and has advanced novel legal theories not suggested by prior civil or criminal proceedings. *Lindy II, supra*, at 117; *Grinnell I, supra*, at 471. It is true, as defendants point out, that this case was a fairly straightforward antitrust action, and that the trial transcript was not bloated by the introduction of countless exhibits and the testimony of hundreds of witnesses. Yet, the probability

of Northeastern successfully establishing liability and proving damages in this case was speculative at best. Contrary to defendants' assertion, Northeastern was not aided in the prosecution of this case through previous judicial and regulatory proceedings. Indeed, this is the first of the many terminal equipment cases of which this Court is aware that has gone to trial. In this connection, Northeastern has twice been required to jump the immunity hurdle, an issue that has been decided in different ways by the various courts that have considered it. In addition, Northeastern succeeded on its pricing claims, which were difficult to prove and, as this Court noted previously, central to Northeastern's case. In view of the complexity of the principal legal issues and the speculative probability of Northeastern's success, the substantial risk undertaken by Northeastern in developing this case warrants an upward adjustment of 15% to the lodestar.

With respect to the risks assumed by Northeastern's counsel, the Court finds that an additional 15% adjustment is appropriate. Counsel expended a total of 4,572.45 hours in the preparation and trial of this case for a total stipulated fee (lodestar) of $498,542.25. Having taken this case on a contingent fee basis, the risk incurred by counsel is clear. Although the risk is mitigated to some extent by the facts that counsel has been reimbursed for expenses throughout the case and that the case is not a class action, an upward adjustment of 15% merely reflects these mitigating factors.

The fact that counsel arranged to work on a contingent fee basis, and therefore, had to wait until the end of the trial to receive compensation does not justify an additional automatic increase to the lodestar. *Kane v. Martin Paint Stores, Inc., supra*, at 1058. In the present case, the delay in receiving payment was not long, since counsel did the bulk of their work in 1979. Moreover, any delay that did exist is offset by the fact that counsel will be paid at current rates, rather than at rates in effect for years as far back as 1975. The Court finds, therefore, that no adjustment

for the delay in receiving payment is warranted.

Courts have allowed both increases and decreases to the lodestar to reflect quality. Since quality is automatically reflected in the hourly rate, a court may increase the lodestar only where services have been "exceptional" and of a much higher quality than that to be expected from attorneys who are paid at the same hourly rate. *Lindy II, supra,* at 118.

There are two factors that the court in *Lindy II* indicated should be considered in determining whether to adjust the lodestar for quality work: the result obtained and the attorney's methods utilized in processing the case. With respect to the first element, the lodestar approach represents an attempt to "minimiz[e] the important role traditionally played by the magnitude of the recovery." *Grinnell II, supra,* at 1099 (quoting from *Grinnell I, supra,* at 471). Consequently, a successful result in and of itself is not grounds for increasing the lodestar. However, a court may, as this Court elects to do in the present case, adjust the lodestar "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum amount of time invested, . . . ." *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 168 (3d Cir. 1975). There can be little doubt that the $16.5 million verdict was a substantial benefit to Northeastern. Although the almost $500,000 in legal fees appears high, the fees are entirely reasonable when viewed in light of the quantity and quality of of the work performed in this case. Thus, the Court concludes that a final increase of 20% in the lodestar is appropriate to reflect the result obtained.

Although the Court must also consider, in assessing the quality of the work, the methods used by plaintiff's counsel to process this case, the Court finds no further adjustment warranted. While the Court would be remiss in not praising the attorneys for all parties for the professional and efficient manner in which they expedited this case, Northeastern's counsel are not entitled to a methods adjustment to the lodestar, in view of what the Court regards as an unnecessarily disproportionate ratio of partner time to associate time. *See Beech Cinema, Inc. v. Twentieth Century Fox Film Corp., supra,* at 1197. In this case almost 90% of the work done on Northeastern's behalf was performed by partners. Much of this work (the preliminary review of documents for instance) could have been carried out as ably by associates or paralegals. Defendants should not be penalized for the conscious decision of plaintiff's counsel as to the management of case preparation responsibilities.

The Court concludes, based on all the factors enumerated above, that an adjustment of 50% in the lodestar is warranted in the present case.[22] Accordingly, it is hereby ordered that Northeastern's counsel be awarded $747,813.38 in attorneys' fees.

## VI

## CONCLUSION

To summarize, the Court finds: (1) that defendants are not immune from the antitrust laws for any of the conduct for which they have been found liable; (2) that the evidence proffered at trial was sufficient to support each of the jury's verdicts on all liability and damage issues; (3) that there

---

**22.** This adjustment is in line with what other district courts in the circuit have awarded. *See, e. g., Michelman v. Clark–Schwebel Fiber Glass Corp.,* 1975–2 Trade Cas. ⁋ 60,551 (S.D. N.Y.1975) (approximately 14% increase), *appeal dismissed as moot,* 534 F.2d 1036 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *FLM Collision Parts, Inc. v. Ford Motor Co., supra* (approximately 56% increase). The courts in this circuit have permitted a doubling of the lodestar only in class

actions. *See City of New York v. Darling–Delaware,* 440 F.Supp. 1132 (S.D.N.Y.1977); *In re Master Key Antitrust Litigation,* 1978–1 Trade Cas. ⁋ 61,887 (D.Conn.1977). The only district court that more than doubled the lodestar was reversed in *Grinnell II.* Cf. *Seigal v. Merrick,* 619 F.2d 160 (2d Cir. 1980).

In view of the case law that has developed in this circuit, Northeastern's request for a seven–fold adjustment to the lodestar is unrealistic.

are no grounds for a new trial; and (4) that Northeastern's counsel are entitled to attorneys' fees in the amount of $747,813.38.

It is so ORDERED.