**INTERNATIONAL DISTRIBUTION CENTERS, INC., Plaintiff,**

v.

**WALSH TRUCKING CO., INC., Coastal Freight Lines, Inc., Hempstead Delivery Co., Inc., National Retail Transportation, Inc., Francis J. Walsh, Jr., Kenneth B. Henning, Mark S. Tice, Raymond Weiss, Carmine Sabatini and Chuck Hannon, Defendants.**

No. 82 Civ. 8709 (JFK).

United States District Court, S.D. New York.

Jan. 8, 1986.

Law Firm of Malcolm A. Hoffman, New York City (Malcolm A. Hoffman, Peter L. Altieri, Craig Schiller, Lisa A. Frey, of counsel), for plaintiff.

Simon, Uncyk & Borenkind, New York City (Marc L. Zoldessy, Alan Borenkind, of counsel), Bathgate, Wegener, Wouters & Neumann, Lakewood, N.J., (Timothy Neumann, of counsel), for defendant Francis J. Walsh, Jr.

Warshaw Burstein Cohen Schlesinger & Kuh, New York City (James E. Daniels, of counsel), for respondent Donna Walsh.

Thomas Fitzpatrick, New York City (Thomas Fitzpatrick, of counsel), for respondent Norbert Walsh.

Sharfman, Shanman, Poret & Siviglia, P.C., New York City (Alan Handler, of counsel), for respondents Simon, Uncyk & Borenkind and Marc L. Zoldessy.

## OPINION and ORDER

KEENAN, District Judge:

The instant motions find their genesis in an antitrust action which was tried for eight weeks before a jury. The jury rendered a verdict for plaintiff in the amount of $13,208,697, which was trebled under the Clayton Act for a total award of $39,626,091 in favor of plaintiff. Defendants then moved for judgment n.o.v. or for a new trial. The Court denied this motion by Opinion and Order dated June 19, 1985, but ordered remittitur in the amount of $1,364,124. On June 20, 1985, the Court entered an amended judgment in plaintiff's favor, in the amount of $38,261,967.

Familiarity with the prior proceedings in this case is presumed. For those not familiar, *see* Opinion and Order, June 19, 1985 and Amended Judgment, June 20, 1985. Since the date of these filings, certain parties to this suit have filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. The "Walsh defendants", comprised of Frank Walsh individually and all the corporate defendants, filed their Chapter 11 petition in the District of New Jersey on June 20, 1985. International Distribution Centers ("IDC") filed its petition under Chapter 11 in the Bankruptcy Court of the Southern District of New York on July 15, 1985.

IDC moves this Court for an order compelling further discovery from defendants, and for an order holding defendant Frank Walsh and Norbert Walsh, and Donna Walsh, non-parties, and certain of their attorneys, (collectively, "the respondents"), in contempt of court.[1] Also before the Court are IDC's motions requesting issuance of an order requiring the non-bankrupt defendants to post a supersedeas bond during the pendency of their appeal to the Court of Appeals for the Second Circuit, and various defendants' related motions for a stay of execution of the judgment entered against them on June 20, 1985. IDC further moves for assessment of attorneys fees and supplemental attorneys fees. IDC also seeks a permanent injunction against the non-bankrupt defendants, to supersede the preliminary injunction now in effect pursuant to the Court's order in the amended judgment entered on June 20, 1985. IDC suggests that the permanent injunction not be entered against the Chapter 11 defendants during the pendency of the bankruptcy stay, but rather be kept on the Court's docket until expiration of, or other relief from the stay. The Court will treat each of these motions in turn.

### A. THE MOTION FOR A CONTEMPT ORDER.

1. *The Court's power to hold certain defendants in contempt of the August 20, 1984 Stipulation and Order.*

On August 20, 1984, IDC and the defendants entered into a stipulation containing the following language:

---

1. The attorneys are the New York law firm of Simon, Uncyk & Borenkind, specifically, Marc L. Zoldessy, a member of the firm, and Bathgate, Wegener, Wouters & Neumann, specifically, Timothy Neumann, a member of the firm, which is located in New Jersey. The Bathgate firm represents Frank Walsh in proceedings now pending in Bankruptcy Court in New Jersey.

That during the pendency of this stay, the defendants will not take and have not taken any action since the rendering of the verdict to hide, secrete, dissipate or transfer (except for adequate current consideration) the assets or stocks of each and/or all of them other than action taken in the regular course of business.

The stipulation was "so ordered" by the Court. After the ordering of the stipulation, IDC alleges, the respondents took various actions which constituted transfers of assets for no consideration, in violation of the August 20, 1984 stipulation and order. The transfers involved real property located in Saddle River, Mantaloking, and Englewood Cliffs, all in New Jersey. In addition, IDC asserts that a stock transfer and related stock pledge and voting trust agreement involving Frank, Donna and Norbert Walsh constituted an outright transfer of defendants' assets, also in violation of the August 1984 stipulation and order ("the Order").

At IDC's request, certain discovery was allowed to proceed relating to the allegedly violating transfers. On April 1, 1985, prior to the filing of bankruptcy by any of the defendants, IDC deposed Frank Walsh pursuant to a subpoena which sought the production of extensive financial records. Mr. Zoldessy, Frank Walsh's attorney, produced two W–2 forms in response to the subpoena. IDC alleges that this production was insufficient and contemptuous. IDC requested the opportunity to inquire into the challenged transfers and to proceed formally with a contempt motion. This motion is now before the Court.

(a) *The nature of the asserted contempt.*

Respondents assert that even if they are found to have acted in contempt of court, their activities constituted civil, not criminal contempt. Respondents argue that while criminal contempt proceedings are not stayed by § 362(a) pursuant to an exception found at § 362(b)(1), civil contempt proceedings are automatically stayed. The Court disagrees. The numerous cases cited in the body of this opinion indicate that certain civil contempt proceedings may continue even in the face of a bankruptcy petition. The absence of a specific exception to § 362 is not dispositive of the issue of the effect of the bankruptcy filing on the civil contempt action. Though IDC is not explicit as to the nature of the contempt it seeks, the Court determines that the instant motion suggests civil contempt.

As the Second Circuit has stated:

Though the use of judicial power to secure future compliance with a court order involves civil contempt remedies, *Shillitani v. United States,* 384 U.S. 364, 368–70, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966), the use of such power in the aftermath of past violations can take the form of either civil contempt remedies or criminal contempt punishments, or both, *Backo v. Local 281, United Brotherhood of Carpenters & Joiners of America,* 438 F.2d 176 (2d Cir.1970), *cert. denied,* 404 U.S. 858, 92 S.Ct. 110, 30 L.Ed.2d 99 (1971). When an injunction has been violated, civil contempt remedies are available to provide compensation or other remedial relief for the party for whose benefit the injunction was entered, and criminal contempt penalties may be imposed, where appropriate, to punish the violation and vindicate the court's authority.

*Universal City Studios v. New York Broadway International Corp.,* 705 F.2d 94, 96 (2d Cir.1983). Certainly, one of the considerations on this motion is the Court's interest in "secur[ing] future compliance," with its Order. *Shillitani v. United States,* 384 U.S. 364, 368–70, 86 S.Ct. 1531, 1534–35, 16 L.Ed.2d 622 (1966).[2] Thus, coercive, civil contempt seems the appropriate route. On the other hand, the thrust of

---

**2.** *See also Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981) ("[a] court has the inherent power to hold a party in civil contempt in order to 'enforce compliance with an order of the court or to compensate for losses or damages.'") (citations omitted), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111.

IDC's argument is that respondents have already violated the Order. This argument would indicate that punitive relief in the form of criminal contempt is called for. Indeed, since the Court finds that it is the Court's own interest in vindicating its authority, rather than IDC's interest in "compensation or other remedial relief" which is the impetus for this motion, criminal contempt penalties might be apposite. As other courts have noted, the distinction between criminal and civil contempt is not always clear. *United States v. United Mine Workers*, 330 U.S. 258, 298–99, 67 S.Ct. 677, 698–99, 91 L.Ed. 884 (1947); *United States v. Rylander*, 714 F.2d 996, 1001 (9th Cir.1983).

■ Much light, however, is shed by the Second Circuit's opinion in *United States v. Wendy*, 575 F.2d 1025, 1029 (2d Cir.1978). In a note, the court analyzed the two types of contempt as follows:

> The civil nature of the contempt is not turned criminal by the court's efforts at vindicating its authority, an interest which may be implicated in either civil or criminal proceedings.... *See* Moskovitz, *Contempt of Injunctions, Civil and Criminal*, 43 Colum.L.Rev. 780, 785–86 (1943).

> Finally, while we are satisfied that the contempts here were civil in nature, the presumption in favor of finding civil as opposed to criminal contempt where there is some doubt as to the nature of the contempt, 3 C. Wright, *supra*, § 704,

at 158, militates in favor of concluding that the citations of Mr. Wendy were for civil contempt.

*Wendy* at 1029, n. 13. Using this discussion as a springboard, this Court finds that the fact that it is potentially seeking to vindicate its authority, rather than attempting to compensate IDC, does not compel a criminal contempt proceeding. Civil contempt remains an option. In fact, as the *Wendy* court stated, the presumption favors a proceeding for civil contempt.

■ Using factors set forth in *Wendy*, the civil nature of the asserted contempt is fairly obvious. The Court is concerned with coercing future compliance. Respondents, if they are found to have acted in contempt, could purge themselves of such contempt, or avoid the contempt completely, by reversing the effect of the allegedly wrongful conduct. Any fines which might be levied are not "unconditional punishments for wrongs committed." *Wendy* at 1029, n. 13.

Accordingly, the Court determines that the instant motion is one seeking an order holding defendants in civil contempt.

### (b) *The effect of § 362.*

■ The next question for the Court is whether the automatic stay provisions of 11 U.S.C. § 362(a) ("§ 362") suspend the district court's power to adjudicate over the action during the pendency of respondent Walsh's bankruptcy proceedings.[3] Based

---

3. 11 U.S.C. § 362(a) reads:

 [e]xcept as provided in subsection (b) of this section, a petition filed under section 301, 302 or 303 of this title ... operates as a stay, applicable to all entities, of—

 (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceedings against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

 (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

 (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

 (4) any act to create, perfect, or enforce any lien against property of the estate;

 (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

 (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

 (7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

on a reading of the case law, this Court concludes that its inherent power to "punish the debtor for contumacious conduct against the dignity of either the state or federal court," is not curtailed by the bankruptcy action. *Guariglia v. Community National Bank & Trust Co.,* 382 F.Supp. 758, 761 (E.D.N.Y.1974).

The first component issue before the court is whether a motion for contempt is made to "satisfy a judgment or simply to punish." *Meyerson v. Werner,* 683 F.2d 723, 728 (2d Cir.1982); *In re Marini,* 28 B.R. 262, 265 (Bankr.E.D.N.Y.1983). This is a question of fact left to the Court's discretion. Respondents argue that since the instant motion was brought on by IDC, the judgment creditor, it is in fact an attempt to collect on the judgment entered in its favor. However, the Court finds as a factual matter that IDC is not seeking to collect on the pre-petition judgment debt. Rather, IDC is concerned with the respondents' asserted defiance of the Court's Order directing that it transfer no assets except for adequate current consideration. Given the nature of the relief sought by IDC on its motion, none of which involves payment of money by respondents to IDC, the fact that IDC has initiated the instant contempt proceedings is of no moment. *In re Dumas,* 19 B.R. 676, 678 (Bankr.App. 9th Cir.1982). Since the motion "does not involve a determination of the ultimate obligation of the bankrupt nor does it represent a ploy by a creditor to harass him", the instant fact situation represents a clear example of a motion made to punish, and not one made to collect on a judgment.

Having concluded that the instant motion is indeed a motion for contempt, the Court can proceed to consider whether the motion is stayed by § 362. Numerous courts have wrestled with this issue. In *David v. Hooker, Ltd.,* 560 F.2d 412, 418 (9th Cir. 1977), the court found pursuant to Bankruptcy Rule 401[4] that "it was ... within the trial judge's power to consider whether

the [bankrupt] defendant and its agent were in contempt of court pursuant to Rule 37 of the FRCP for failure to follow the prior order" of the court regarding discovery.

In *In re Dumas,* 19 B.R. 676, 677 (Bankr. App. 9th Cir.1982), the Ninth Circuit bankruptcy appeals panel stated that, "the state court's sentence for contempt after bankruptcy was not affected by the automatic stay provision of 11 U.S.C. § 362 even if it were imposed at the request of the [judgment creditor.]" Thus, it is apparent that courts have proceeded to enforce their orders entered prior to the filing of bankruptcy petitions by defendant-debtors, using the contempt mechanism, and regardless of the source of the request.

Moreover, as the *Dumas* court stated, quoting *In re Hall,* 170 F. 721 (S.D.N.Y. 1909):

> ... though the stay would prevent any further steps from being taken in the action, yet if, prior to the stay, the bankrupt had actually disobeyed the order of the court, his punishment must be entirely for the court. It can make no difference that the court has not fixed this punishment prior to the stay itself.

*In re Dumas* at 678. Respondents attempt to distinguish *Hooker* and *Dumas* from the instant procedural situation through reliance on *In re Thayer,* 24 B.R. 491 (Bankr. W.D.Wis.1982) and *In re Rhoten,* 22 B.R. 335 (Bankr.M.D.Tenn.1952). The *Thayer* court itself distinguished *Hooker* and *Dumas* by acknowledging that while *Hooker* and *Dumas* sought to enforce discovery orders entered prior to the bankruptcy filing, the *Thayer* case involved an effort by the movant to collect on an unpaid debt. This court has found, as a factual matter, that IDC is not seeking to collect on the pre-petition debt, and is not moving at this time out of a "collection motive." *Thayer* at 493. Thus, the fact that the motion to hold certain parties in contempt was

---

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

**4.** Bankruptcy Rule 401, predecessor to § 362 of the Bankruptcy Code, is "essentially similar" to § 362. *In re Dumas* at 677.

brought on by IDC is irrevelant, and *Thayer* does not advance respondents' position.

■ Similarly, respondents' reliance on *Rhoten* is misplaced. The *Rhoten* facts did not entail a violation of a court order as did the *Hooker* and *Dumas* facts, but simply the attempt of a creditor to continue with discovery after the debtor had filed a petition in bankruptcy. Though IDC seeks to pursue discovery, the discovery is related to the contempt proceedings, and moreover, is incidental to the main goal of the motion, which is to vindicate the integrity of the Court, based on alleged violations of a specific court order. Accordingly, the Court finds that regardless of the source of the contempt motion, the instant request is one designed to uphold an order of this Court, and is not one calculated to enforce a money judgment, or to harass a defendant. Consequently, § 362 does not enjoin the Court from proceeding to enforce its order issued on August 20, 1984, a full ten months prior to the date upon which defendants filed in Chapter 11.

In the words of a federal bankruptcy court interpreting the legislative history of § 362, "[a]lthough Section 362 is a shield to protect the debtor to provide for a 'fresh start,' the automatic stay was not intended by Congress to be used as a sword." *Foerst v. Clowser*, 39 B.R. 883, 886 (Bankr., E.D.Va.1984). The Court is not barred from proceeding to analyze the allegedly contemptuous acts.

## 2. *The Allegedly Contemptuous Acts.*

Having determined that the instant motion sounds in civil contempt, since respondents could purge themselves of the potential contempt, and since the Court, though primarily concerned with upholding its integrity, is also interested in enforcing future compliance with its Order, the Court now turns to the standard for determining whether a civil contempt order should issue.

■ In any contempt proceeding, movants have the burden of establishing respondents' non-compliance by clear and convincing evidence. *Perfect Fit Industries, Inc. v. Acme Quilting Co., Inc.*, 646 F.2d 800, 808 (2d Cir.1980). A bare preponderance of the evidence will not support a finding of contempt. *Andre Matenciot Inc. v. David & Dash, Inc.*, 422 F.Supp. 1199, 1208 (S.D.N.Y.1976). In addition, a contempt finding is only appropriate when the terms of the underlying order are "specific and unambiguous." *Folsom v. Blum*, 554 F.Supp. 828, 830 (S.D.N.Y.1982).

Although the August 20, 1984 Order was clear and definite as to the general goal of restraint on transfer "except for adequate current consideration," a thorough reading of IDC's voluminous motion papers and supporting evidence does not persuade the Court that a finding of contempt is appropriate. Though IDC does raise questions as to the exact equivalence of the consideration received by respondents in relation to the transferred assets, the questions fail to surmount the hurdle imposed by movant's burden of "clear and convincing" evidence of non-compliance. The lengthy explanation of the respondents regarding the transfers and stock transactions indicate that some form of consideration was received by respondents in each sale, mortgage, or exchange. The background and purpose of the Order were to ensure that the defendants did not effectively deplete their assets during the stay of judgment, and in fact, they have not, to date, done so.[5] *United States v. Greyhound Corp.*, 508 F.2d 529, 532 (7th Cir.1974). The Court does not observe that the broad goal of the Order was violated.

■ In addition, the Court notes that no prior warnings have been issued regarding suspected non-compliance. The Court is loathe to impose a contempt citation at the first instance of an alleged violation. Furthermore, as to the law firms and lawyers accused of contempt, the instant motion is an even more "serious matter," which may have "considerable economic consequences." *United States v. Wendy*

---

5. The effect of the bankruptcy petition on the Walsh defendants' assets is, of course, yet to be seen.

at 1030. The Court is thus even less willing to issue a contempt order upon lawyers at this first suggestion of a violation.

 There being questions as to the adequacy or inadequacy of the consideration received on the various transfers which prevent IDC from establishing respondents' non-compliance by clear and convincing evidence, the Court will not issue a contempt order at this time. Respondents are directed to avoid further actions which might give rise to suspicions of violations, and are on notice that any incontrovertible violations of this Court's orders will be dealt with as possible contempts.[6] It is assumed that the bankruptcy court and trustee in bankruptcy will maintain the bankrupt estate in compliance with all legal requirements, and provide for appropriate discovery. Respondents are nevertheless advised, as the above discussion indicates, that the automatic stay provisions of § 362 do not divest this Court of the power to enforce, through contempt orders, its clear and definite pre-bankruptcy Order. The Court will not shrink from vindicating its authority, should it become necessary to do so.

## B. THE MOTIONS FOR STAY OF EXECUTION OF JUDGMENT PENDING APPEAL, AND FOR A SUPERSEDEAS BOND PENDING APPEAL.

 At a hearing held on June 26, 1985, the five non-bankrupt defendants[7] orally moved for a stay of execution of judgment pending the disposition of the appeal of this matter. This motion was renewed in written form by Chuck Hannon on July 8, 1985, by Kenneth E. Henning on July 9, 1985, and by Mark S. Tice on July 10, 1985.[8] In response, IDC renewed its earlier motion requesting that the non-bankrupt defendants be required to post a supersedeas bond in the full amount of the June 20, 1985 amended judgment, plus 11%, as provided for by Federal Rule of Civil Procedure 62(d) and by Rule 41 of the Civil Rules for the United States District Court for the Southern and Eastern Districts of New York. Rule 41 provides, in pertinent part:

A supersedeas bond, where the judgment is for a sum of money only, shall be in the amount of the judgment plus 11% to cover interest and such damages for delay as may be awarded.... When the stay may be effected solely by giving of the supersedeas bond, but the judgment or order is not solely for a sum of money, the court, on notice shall fix the amount of the bond.

Various courts, including the Court of Appeals for the Second Circuit, have held that a district judge may exercise discretion under Federal Rule of Civil Procedure ("FRCP") 62(d) and the local civil rule of

**6.** "Criminal contempt is established when it is shown that the defendant is aware of a clear and definite court order and willfully disobeys the order." *United States v. Rylander,* 714 F.2d 996, 1001–2 (9th Cir.1983). "Willfulness is, of course, an element of criminal contempt and must be proven beyond a reasonable doubt." *United States v. Greyhound Corp.,* 508 F.2d 529, 531 (7th Cir.1974) (citations omitted). The affidavits of the alleged contemnors are consistent in stating that any transfer of assets was made with a good faith belief that the transactions "would not constitute a violation of the stipulation." (Frank Walsh Aff. ¶¶ 7a, 13–15; Donna Walsh Aff. ¶¶ 9, 10; Norbert Walsh Aff. ¶¶ 2, 4, 8, 10; Marc L. Zoldessy Aff. ¶ 2; Alan Borenkind Aff. ¶¶ 2–4; Timothy P. Neumann Aff. ¶¶ 5–8, 9A, 9C–9F, 10; Thomas Fitzpatrick Aff. ¶¶ 5–7, 9, 13).

There being a reasonable doubt as to the willfulness of the allegedly violating behavior of all the asserted contemnors, a citation for criminal contempt should certainly not issue. In terms of the analysis under the standard for criminal contempt, which the Court considers in the alternative from the civil contempt evaluation, respondents' sworn explanations suggest, at the worst, a "[g]ood faith pursuit of a plausible though mistaken alternative." *In re Brown,* 454 F.2d 999, 1007 (D.C.Cir.1971). Thus, the Court declines to find at this time that respondents acted either in civil or criminal contempt of the Order.

**7.** The non-bankrupt judgment debtors are Kenneth E. Henning, Chuck Hannon, Mark S. Tice, Raymond Weiss and Carmine Sabatini.

**8.** Henning's written application takes the form of a motion and supporting affidavit. Tice and Hannon submit affidavits without motion papers.

this Court.[9] In *Trans World Airlines, Inc. v. Hughes,* 515 F.2d 173 (2d Cir.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1147, 47 L.Ed.2d 341 (1976), the Second Circuit stated that the district judge "quite properly held that he had the power to provide for a form and amount of security different from the supersedeas bond." *Trans World* at 176.

When such variation from the rule is appropriate is a question which has received a certain amount of consideration. As the Court of Appeals for the District of Columbia has stated:

> [b]ecause the stay [of judgment pending appeal] operates for the appellant's benefit and deprives the appellee of the immediate benefits of this judgment, a full supersedeas bond should be the requirement in normal circumstances, such as where there is some reasonable likelihood of the judgment debtor's inability or unwillingness to satisfy the judgment in full upon ultimate disposition of the case and where posting adequate security is practicable. In unusual circumstances, however, the district court in its discretion may order partially secured or unsecured stays if they do not unduly endanger the judgment creditor's interest in ultimate recovery.

*Federal Prescription Service v. American Pharmaceutical Association,* 636 F.2d 755, 760–61 (D.C.Cir.1980).

In the case now before the Court, it appears that the Chapter 11 petition of the principal Walsh defendants has already created a threat to the judgment creditor's interest in ultimate recovery. The five remaining non-bankrupt defendants appear to be, on the basis of the three representative affidavits, non-corporate individuals, none of whom is likely to be capable of posting a bond in the full amount of the approximately $38 million judgment. Thus, the "posting of adequate security"

for the full judgment is far from "practicable". *Federal Prescription Service* at 760. These are not the "normal circumstances," given the relatively inadequate resources of the non-bankrupt individual defendants, in which a full supersedeas bond should, or can, be required.

Employing the discretion afforded under *Trans World,* the Court directs that each of the five individual defendants post a bond in the amount of $10,000. While this total of $50,000, regrettably, cannot nearly provide IDC with the "immediate benefits of [the] judgment," it will serve as some protection during the pendency of the appeal. Any full bond would be wholly "impracticable;" accordingly, the Court, in these unfortunate and unusual circumstances of bankrupt plaintiff and defendants, must use its discretion to protect appellee while not concurrently driving the remaining non-bankrupt defendants into their own personal Chapter 11 filings.

A stay of execution of the amended judgment is entered upon the posting by each of the five individual non-bankrupt defendants of a $10,000 supersedeas bond with the Court.[10]

## C. THE MOTION FOR A PERMANENT INJUNCTION.

This case was heard by a jury, which after an eight week trial rendered a general verdict in favor of the plaintiff, answering special interrogatories in the process, on August 1, 1984. A preliminary injunction had been entered against defendants by Judge Ward on January 11, 1983, which was amended by a subsequent order dated January 21, 1983, and again on February 14, 1983. This Court continued the preliminary injunction in this judgment entered on August 13, 1984. On June 19, 1985, after consideration of a motion for judgment n.o.v. or for a new trial, the Court issued

---

**9.** The instant decision is made pursuant to Rule 41 of the Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York; the pertinent Second Circuit case involved an interpretation of the substantially similar predecessor Local Rule 33.

**10.** The Court notes that, in any event, collection on the antitrust judgment as against the Walsh defendants is stayed during the pendency of the bankruptcy action.

an opinion and order denying defendants' motions. Pursuant to this opinion and order, an amended judgment was entered on August 20, 1985, at which time the preliminary injunction was again extended. The preliminary injunction is still in effect.[11] IDC moves to have a permanent injunction entered. For the reasons set forth below, this motion is granted.

■ Section 16 of the Clayton Act, 15 U.S.C. § 26 provides as follows:

§ 26. Injunctive relief for private parties; exception; costs

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings....

The fact of "threatened loss or damage by a violation of the antitrust laws" having been identified by the jury and confirmed by this Court, the Court may enjoin further violations or conduct of the same type or class which may fairly be anticipated. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132–33, 89 S.Ct. 1562, 1581–82, 23 L.Ed.2d 129 (1969). In *Zenith,* the Supreme Court stated:

In exercising its equitable jurisdiction, "[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." ... We see no reason that the federal courts, in exercising the traditional equitable powers extended to them by § 16, should not respond to the "salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts." ... Although a district court may not enjoin all future illegal conduct of the defendant, or even all future violations of the antitrust laws, however unrelated to the violation found by the court, ... "[w]hen the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." ... This is particularly true in treble-damage cases, which are brought for private ends, but which also serve the public interest in that "they effectively pry open to competition a market that has been closed by defendants' illegal restraints." (Citations omitted). (Footnote omitted).

■ These principles were recently affirmed in *Paschall v. Kansas City Star Co.*, 695 F.2d 322, 335 (8th Cir.1982), *overruled en banc on other grounds,* 727 F.2d

11. Judge Ward's injunction, provides as follows:
 1. That the defendant, National Retail Transportation, Inc., its officers, agents, servants and employees, and all persons acting in aid of, or in concert with, them, including but not limited to former employees of International Distribution Centers, Inc. be and they are hereby restrained and enjoined, pending the determination of this action, from soliciting current employees of International Distribution Centers, Inc. to work for any of the following corporations:
 National Retail Transportation, Inc.
 Walsh Trucking Co., Inc.
 Coastal Freight Lines, Inc.
 Hempstead Delivery Co., Inc.; and

 2. That the defendant, National Retail Transportation, Inc., its officers, agents, servants and employees, and all persons acting in aid of, or in concert with, them, be and they hereby are restrained and enjoined, pending the determination of this action, from using confidential information, as described in the foregoing findings, to solicit customers of International Distribution Centers, Inc., provided that plaintiff first give security in the sum of $50,000.00 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined, such bond to be approved by the Court or by the Clerk of the Court no later than January 24, 1983.

692 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 222, 83 L.Ed.2d 152 in which the Court held:

> The district court has both the duty and the authority to fashion relief that terminates the illegal acts of monopolization, that ensures that they do not recur and that eliminates their consequences. *See National Society of Professional Engineers v. United States,* 435 U.S. 679, 697, 98 S.Ct. 1355, 1368, 55 L.Ed.2d 637 (1978); *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 250, 88 S.Ct. 1496, 1500, 20 L.Ed.2d [562] (1968). Moreover, district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *International Salt Co. v. United States,* 332 U.S. 392, 400–01, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947).

Acting upon its duty and authority, the Court issues the following permanent injunction. Notes relating to the text are for explanatory purposes only, and are not made a part of the permanent injunction.

\* \* \* \* \* \*

## ORDER OF PERMANENT INJUNCTION

ORDERED, ADJUDGED AND DECREED, that the preliminary injunction heretofore issued is dissolved; and that plaintiff's motion for a permanent injunction is granted as follows:

A. The defendants and each of them are permanently enjoined from:

(1) directly or indirectly soliciting or inviting the hiring of, or hiring, any employees of the plaintiff;

(2) directly or indirectly making false or misleading representations about plaintiff or its business;

(3) formulating and/or pursuing any plan to destroy plaintiff as a competitor in interstate commerce; and

(4) conspiring with one another to do any of the foregoing acts.[12]

B. The defendants and each of them are enjoined for a period of three years from the date hereof from:

(1) providing trucking services in interstate commerce between and among points in the states of New York, New Jersey, and Pennsylvania without having first filed an applicable tariff with the Interstate Commerce Commission; and

(2) providing trucking services in intrastate commerce within the State of Pennsylvania, without having first filed an applicable tariff with the Pennsylvania Utility Commission;

(3) offering to sell, or selling, trucking services between or among any points in the States of New York, New Jersey, and Pennsylvania for the transportation of garments on hangers at prices below those contained in such filed tariffs. "Garments on hangers" for the purposes of this sub-paragraph shall include garments on hangers as well as raw materials used in the manufacture of garments to be shipped by trucks on hangers;

(4) offering to sell or selling any transportation services at an unreasonably low price or at a price that is below cost for the purpose of attempting to monopolize or monopolizing the transportation of garments on hangers between and among points in New York, New Jersey, and Pennsylvania, or for the purpose or with the natural and probable effect of destroying competition or eliminating a competitor engaged in the transportation of garments on hangers.[13]

C. The defendants shall comply with each of the following conditions:

(1) Defendants shall submit to plaintiff and file with the Clerk of the Court an affidavit in substantially the form at-

**12.** The specific language chosen is modeled after the permanent decree in *C. Albert Sauter Company, Inc. v. Richard S. Sauter Company, Inc.,* 368 F.Supp. 501, 522 (E.D.Pa.1973).

**13.** Although courts should not be in the business of ratemaking, the Second Circuit has stated that a price-related injunction in a private antitrust case is appropriate when limited to a specific geographic area and a specific product or service market. *See John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.,* 588 F.2d 24, 30–31 (2d Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979).

tached as Exhibit A from both Frank J. Walsh, Jr. and also from the chief financial officer of each defendant corporation, for each corporate defendant's five largest customers, during each calendar quarter for the preceding calendar quarter, as follows:

| Annual Quarter | Filing Date |
| --- | --- |
| 1 | April 20 |
| 2 | July 20 |
| 3 | October 20 |
| 4 | January 20 |

Defendants shall file such affidavit for twelve consecutive calendar quarters beginning with the first filing date after the date of entry hereof, which will be January 20, 1986.

(2) In addition, defendant shall cause its public accounting firm to prepare an audited and certified quarterly profit and loss statement with information categories in substantially the form annexed as Exhibit B for defendants' less-than-truckload operations between and among points in New York, New Jersey, and Pennsylvania. This statement shall be sent to plaintiff and filed with the Clerk of the Court at the same intervals as the affidavits required in the preceding subparagraph.

(3) The provisions of this judgment shall apply to the defendants and to each of their respective subsidiaries, successors, assigns, officers, directors, employees, and agents and to all other persons in active concert or participation with any of them who receive actual notice of this order.

(4) Each corporate defendant, at least 60 days prior to the transfer, sale or disposition of all, or substantially all, of the assets used by it shall provide notice in writing to the plaintiff concerning the planned transfer, sale or disposition. The notice shall identify the person(s) acquiring such assets, the terms, and the expected consummation date of the transaction.

D. Each corporate defendant is ordered and directed:

(1) To mail or otherwise furnish within sixty (60) days after the entry of this order a copy thereof to each of (i) its officers and directors, (ii) its agents and employees with supervisory or management responsibility, or with responsibility over rates or rate matters, including billing and collections, and (iii) the officers and directors of its parent and subsidiary corporations and within seventy (70) days from the aforesaid date of entry to file with the Clerk of the Court and the plaintiff an affidavit setting forth the fact and manner of compliance with this section separately stating the names of each person so notified;

(2) To establish a reasonable program for dissemination of, education as to, and compliance with this judgment, involving each corporate officer, director, employee and agent having responsibilities in connection with or authority over the establishment of rates or rate matters, including billing and collections, advising them of their obligations under this judgment.

(3) To furnish to plaintiff on or about the anniversary date of this order for a period of three (3) consecutive years from the date of its entry, an account of all steps said defendant has taken during the preceding year to discharge its obligations under this section and to include with said account copies of all written directives issued during the prior year with respect to compliance with the terms of this judgment.

E. The requirements imposed on defendants pursuant to Sections C(1), (2), (3) and (4); and D(2) and (3) shall terminate upon the filing with the Clerk of this Court a full satisfaction of judgment.

F. The Court shall retain jurisdiction of this matter in order to enforce the terms of this order. This order shall be stayed as against bankrupt defendants during the pendency of bankruptcy proceedings.

\* \* \* \* \* \*

### D. THE MOTION FOR ATTORNEYS' FEES.

Except for the motions to hold defendants in contempt, and that motion filed

relating to defendants' request for a stay pending appeal, on which IDC prevailed only partially, the plaintiff-movant in this case has been sustained on every motion related to the judgment in the instant action. Under Section 4 of the Clayton Act, 15 U.S.C. § 15 and pursuant to this Court's amended judgment of June 20, 1985 calling for attorneys' fees for plaintiff's counsel "to be set by the Court", the Court will award attorneys' fees at this time. Although the automatic stay provision of § 362 may prevent IDC from proceeding against the bankrupt defendants in collecting attorneys' fees, IDC may proceed with respect to the five non-bankrupt defendants. The automatic stay pertaining to the Walsh defendants does not prevent further judicial proceedings from advancing against non-bankrupt co-defendants. *Williford v. Armstrong World Industries, Inc.*, 715 F.2d 124 (4th Cir.1983).

All that remains, then, is to calculate the appropriate total amount of fees. In its initial application, filed on September 21, 1984, the law firm of Malcolm A. Hoffman ("the Hoffman firm") requested a fee for straight time charges for the time period of October 19, 1983 through August 30, 1984. Plaintiff's counsel submitted figures relating to the hourly rates of attorneys and students in the Hoffman firm; these rates have been adjusted in order to bring them into line with the rates charged by attorneys and students of similar experience in the New York City area, as follows:

| | |
|---|---|
| Malcolm A. Hoffman | $250/hour |
| Peter L. Altieri | $125/hour |
| Craig Schiller | $135/hour |
| Lisa A. Frey | $ 75/hour |
| Dashica Babich | $ 75/hour |
| Tom Gregor—law student | $ 25/hour |
| Herbert Burstein | $225/hour * |
| Burton Agata | $225/hour * |
| Zelby & Burstein—associates | $100/hour * 14 |

**14.** These individuals served as counsel prior to the entry into the case of the Hoffman firm. Herbert Burstein is now deceased. While not denying the appropriateness of fees for these individuals, in order to avoid a "windfall" to the Hoffman firm, fees due non-members of the firm will not be awarded to the firm. Accord-

These rates are used in calculating the amounts to be paid IDC's counsel under both applications for fees.

■ The total hours and related dollar amounts properly billable under the first fee application are:

| | | | |
|---|---|---|---|
| Malcolm A. Hoffman | 1379.50 | $250/hour | $344,875.00 |
| Peter L. Altieri | 1748.75 | $125/hour | $218,593.75 |
| Craig Schiller | 876.25 | $135/hour | $118,293.75 |
| Lisa A. Frey | 846.25 | $ 75/hour | $ 63,468.75 |
| Dashica Babich | 151.50 | $ 75/hour | $ 11,362.50 |
| Tom Gregor—law student | 299.50 | $ 25/hour | $ 7,487.50 |
| Herbert Burstein | 208.75 | $225/hour | $ 46,968.75 |
| Burton Agata | 340.75 | $225/hour | $ 76,668.75 |
| Zelby & Burstein—associates | 15.00 | $100/hour | $ 1,500.00 |

The law in the Second Circuit pertaining to calculation of attorneys fees in antitrust actions is well developed. In *Kane v. Martin Paint Stores, Inc.*, 439 F.Supp. 1054 (S.D.N.Y.1977), *affirmed*, 578 F.2d 1368 (2d Cir.1978), Judge Lasker of this court stated:

> [i]n determining an award of attorney's fees, the starting point is the amount of time spent in the prosecution of the action, by whom the services were rendered and the rates charged. Computation of a figure based on these factors provides a base, or "lodestar" amount ... which is then to be adjusted according to "less objective factors".

*Kane* at 1055 (citations omitted). This "lodestar" approach to attorney's fees was developed by the Court of Appeals for the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973) ("Lindy I"), and in the case of the same name, decided *en banc*, 540 F.2d 102 (3rd Cir.1976) ("Lindy II"). The "lodestar" method was subsequently adopted by the Court of Appeals for the Second Circuit, in two cases entitled *City of Detroit v. Grinnell Corp.*, found at 495 F.2d 448 (2d Cir.

ingly, the amounts to be credited to Burstein, Agata and Zelby & Burstein associates will not be included in the fees awarded under the Hoffman firm's application. They will be calculated separately, and are collectible by the prior counsel themselves, or in the case of Burstein, by his estate.

1974) ("Grinnell I") and 560 F.2d 1093 (2d Cir.1977) ("Grinnell II").

Applying the lodestar analysis to the instant case, the Court determines that the amount of attorneys fees due the Hoffman firm under the first fee application, covering the straight time charges for the period from October 19, 1983 through August 30, 1984, is $764,081.25. For the non-Hoffman firm members, the fees collectible for this period are $125,137.50, as calculated on a straight time basis. Both these figures constitute the lodestar amount as defined in *Lindy* and *Grinnell.* Once the Court has calculated the lodestar figure, it may, providing it "articulates with particularity" the reasons for so doing, add to the lodestar rate on the basis of "other less objective factors, such as the 'risk of litigation', the complexity of the issues, and the skill of the attorneys." *Grinnell II* at 1098. The Court will analyze each of these non-objective factors in turn.

The risk of the instant litigation was quite high. As defined in *Kane v. Martin Paint,* the risk of litigation hinges on an inquiry into the "probability of success at the outset of the litigation." *Kane* at 1058. The court in *Lindy II* described three criteria which might be considered in evaluating the risk factor, which were (1) plaintiff's burden; (2) risks assumed by plaintiff's counsel; and (3) delay in receiving payment. *Lindy II* at 117. As to the plaintiff's burden, it is evident that though no extremely novel issues of antitrust law were presented, IDC's chance of "successfully establishing liability and proving damages ... was speculative at best." *Northeastern Telephone Co. v. American Telephone and Telegraph Co.,* 497 F.Supp. 230, 252 (D.C.Conn.1980), *reversed on other grounds,* 651 F.2d 76, *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). No prior judicial or regulatory proceedings had occurred with respect to defendants' antitrust activities. Therefore, IDC was sailing uncharted waters in bringing a private antitrust action against Walsh and the other defendants. As the duration of the trial indicated, IDC presented lengthy and detailed evidence in order to

succeed on its pricing claims, which were difficult to establish and important to the jury verdict. As to the risks assumed by plaintiff's counsel, since IDC had retained counsel on a contingency basis, the risk of trial and preparation fell squarely on the shoulders of the Hoffman firm. Plaintiff's delay in receiving payment is equally evident. The Hoffman firm entered this litigation in 1983. Although the firm has received certain monthly payments throughout the life of the case, these payments were less than required to maintain the office and the cost of the litigation. Plaintiff's counsel pursued the action not only through trial, but through the long post-trial period, during which time they filed numerous motions in order to preserve the jury's verdict. No award of fees took place during this interim period of over one year.

The second *Grinnell* factor, the complexity of the issues, has been discussed in the context of the risk of litigation. The third factor, the skill of the attorneys, deserves some mention. As *Lindy II* stated, the Court should consider two separate issues in determining the skill of attorneys in an antitrust action. First, a court should evaluate the result obtained, and second, the attorney's methods utilized in processing the case. While a "successful result in and of itself is not grounds for increasing the lodestar," *Northeastern Telephone* at 253, a court may adjust the lodestar "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested." *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 168 (3rd Cir.1975). IDC unquestionably received a substantial benefit from counsel, in the form of a verdict in the amount of $39,626,-091. The Court determines that this substantial verdict would not have been obtained if not for the resourceful endeavors of the Hoffman firm. Plaintiff's counsel had to elicit testimony at trial from 21 hostile witnesses in order to prove the requisite intent elements of the antitrust claim. Counsel for IDC presented succinct

evidence on damages in a complex factual context, sufficient to inform and convince a jury of the appropriateness of a large damage award. IDC's counsel not only responded to the post-trial j.n.o.v. motion of defendants, but filed post-trial motions of its own in order to preserve the substantial verdict. Thus, the Hoffman firm demonstrated resourcefulness and creativity throughout the proceedings in this action, such as to justify a finding by this Court of a high quality of performance.

For the above reasons, the Court determines that the lodestar should be adjusted by a factor of 10%, to reflect the specific risks and skills demonstrated in the litigation. Thus, the total of $764,081.25 awarded under the initial fee application shall be increased to $840,489.37.

■ Since September 4, 1984, plaintiff's counsel prepared papers on the following additional matters: (1) Memorandum in support of plaintiff's application for a reasonable attorney's fee, dated September 21, 1984, and affidavit in support, dated September 24, 1984; (2) Memorandum in support of plaintiff's application for a permanent injunction, dated September 21, 1984; (3) Memorandum in support of plaintiff's application to require defendants to provide adequate security to plaintiff, dated September 21, 1984; (4) Memorandum in opposition to defendants' motion for judgment n.o.v. and a new trial, dated October 10, 1984; (5) Memorandum in support of plaintiff's motion seeking an order for citation of contempt and compelling discovery, dated July 3, 1985 and Affidavit in support, dated the same date; (6) Memorandum in opposition to defendant's request for a stay pending the disposition of the appeal, dated July 3, 1985; (7) Memorandum in support of plaintiff's supplemental application for the costs of suit, including a reasonable attorney's fee, dated July 19, 1985.

Plaintiff has prevailed on items (1), (2), (4) and (7). Plaintiff has prevailed partially on items (3), (5) and (6). Plaintiff's counsel has submitted a supplemental application for fees covering the period from September 4, 1984 to July 19, 1985. The Court will award fees for this period based on the same rates as above. The hours billed by the Hoffman firm, as set forth in the affidavits in support of the supplemental application are as follows:

| | | | |
|---|---|---|---|
| Malcolm A. Hoffman | 342.25 hours | $250/hour | $ 85,562.50 |
| Peter L. Altieri | 367.50 hours | $125/hour | $ 45,937.50 |
| Craig Schiller | 106.00 hours | $135/hour | $ 14,310.00 |
| Lisa A. Frey | 422.25 hours | $ 75/hour | $ 31,668.75 |

The total of these hours is therefore $177,478.75. Given the fact that IDC only prevailed partially as described, the Court will reduce the lodestar amount by fifty percent, for a straight time total of $88,739.37. For the same reasons as enumerated with respect to the first application for fees, this lodestar amount will be increased by a factor of ten percent, for a total of $97,613.30. This figure, then, represents that total of fees for the period from September 4, 1984 through July 19, 1985.

■ Thus, the total amount of fees which the Hoffman firm may collect is the total of the original fee application ($840,489.37) and the supplemental fee application ($97,613.30), or $938,102.67. Prior counsel are entitled to fees in the amount of $125,137.50, representing the straight lodestar figure without any increase based on the subjective factors described in *Lindy* and *Grinnell*. These amounts account for written submissions, research and court appearances from October 19, 1983 through August 30, 1984, and from September 4, 1984 through July 19, 1985, all relating to the successful defense of and recovery of the judgment. The Court is satisfied, having considered the affidavit and exhibits of IDC's counsel, that no duplicative efforts were made in defending the Court's judgment and amended judgment. Accordingly, plaintiff's counsel may move immediately to collect attorneys fees in the amount of $938,102.67 from the non-bankrupt defendants, and may proceed against the Walsh defendants at such time as the instant stay is lifted. The non-Hoffman firm counsel or their representatives may proceed in similar fashion. *See Kane v. Martin Paint,* 439 F.Supp. 1054 (S.D.N.Y.1977), *aff'd,* 578 F.2d 1368 (2d Cir.1978);

*Pitchford Scientific Instruments Corp. v. Pepi, Inc.*, 440 F.Supp. 1175, 1179, (W.D. Pa.1977), *aff'd*, 582 F.2d 1275 (3rd Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 242 (1979).

SO ORDERED.

### Exhibit A
### AFFIDAVIT OF COMPLIANCE

FRANK J. WALSH, JR., being first duly sworn according to law, deposes and says as follows:

1. I am the (officer) of (name of corporate defendant) (the "Corporation") and am fully familiar with the facts stated.

2. During the calendar quarter beginning _____, 198\_\_ and ending _____, 198\_\_, the five (5) largest customers of the Corporation by gross dollar volume of trucking transportation of garments on hangers and raw materials used to manufacture such garments on hangers were as follows:

### EXHIBIT B
### Results of Operations
as at _____

#### Final

Revenue

Operating Expenses:
 General & Adminis. Wages
 Operating Wages
 Fringe Benefits
 Fuel
 Operating Supplies & Expenses
 General Supplies & Expenses
 Operating Taxes & License
 Insurance
 Communications & Utilities
 Depreciation Expense
 Equipment Rental
 Building Rental
 Professional Fees

Total Operating Expenses

Operating Income (Loss)

Interest Expense

Guarantee Fees

Income (Loss) before Taxes

Provision for Taxes

Net Income (Loss)

Retained Earnings

| name of customer | | | address of customer | | |
|---|---|---|---|---|---|
| " | " | " | " | " | " |
| " | " | " | " | " | " |
| " | " | " | " | " | " |
| " | " | " | " | " | " |
| " | " | " | " | " | " |

3. I have personally reviewed all bills rendered by the Corporation to each of the above-mentioned five customers for such trucking services and have reviewed all payments from each of these five customers which correspond to those services.

4. In each case, I have reviewed any applicable ICC and/or PUC tariff and can state unequivocally that none of these customers received trucking services from or on behalf of the Corporation for a price below that stated in each applicable tariff.

5. The applicable tariffs are as follows: (identify by authority, number, page, and date).

---

FRANCIS J. WALSH, JR.

Subscribed and sworn to before me this day of , 198\_\_.

---

Notary Public