**David G. BOOTH, Joseph A. Cannaliato, Vincent Cannaliato, Diane C. Darr, John P. Hakemian, Bruce Hanson, M. Hanson, B. Hanson and M.O. Hanson, as trustees, Peter Hein, Ira Hollenberg, Robert S. Krupp, James J. Monks, Rosalyce Monks, Richard A. Pregiato, Phyllis**

Pregiato, Robert M. Schiffer, Morton J. Seligman and Michele D. Seligman, Charles R. Shaw and Donna L. Shaw, Peter F. Spano and Cathy D. Spano, as trustees, William Tierney, Mary Tierney, and Robert D. Walter, Plaintiffs,

v.

Thomas C. WILSON, Hidden Peak Capital Corporation, Republic Boston Capital Corporation, Republic Management, Inc., Sheldon I. Goldstein, Johnie R. Johnson, Richard E. Parker, Goodhue Limited Partnership and Goodhue Investors Limited Partnership, Defendants.

Thomas C. WILSON, Hidden Peak Capital Corporation, Republic Boston Capital Corporation, Republic Management, Inc., Sheldon I. Goldstein, Johnie R. Johnson, Richard E. Parker, Goodhue Limited Partnership and Goodhue Investors Limited Partnership, Counterclaimants,

v.

Vincent CANNALIATO and ARDOV Corporation, Counterdefendants.

No. 96 Civ. 920(RO).

United States District Court, S.D. New York.

May 1, 1997.

Davidoff & Malito, New York City (Stuart Perlmutter, of counsel), for Plaintiffs.

Kirkland & Ellis, New York City (Yosef J. Reimer, Mark Racanelli, of counsel), Gargill, Sassoon & Rudolph, Boston, MA (Patrick Waters, of counsel), for Thomas C. Wilson.

## AMENDED SUPPLEMENTAL OPINION AND ORDER

OWEN, District Judge.

 While the transcript of the hearing of last Monday, April 28 contains most of the observations, findings and conclusions compelling the finding that Thomas C. Wilson is in deliberate and willful contempt of the court's order of April 7, 1997 to produce documents, and mandating that he be forthwith placed in the Metropolitan Correctional Center as a civil contemnor to purge himself by speedy compliance with the order, a few further observations and findings of fact are appropriate under the circumstances.

This case has been before me for the better part of a year based on a claim of fraud on the part of Wilson in getting investors to come in with him as limited partners in real estate ventures where he diverted their substantial investments for his personal purposes in other businesses.[1] Plaintiff-investors here, after becoming disillusioned, but before commencing suit, worked out a settlement with Wilson providing for a return to them of their entire investments plus attorney's fees.[2] This settlement was reduced to writing and duly executed. Wilson, however, failed to honor the settlement agreement, and this lawsuit was commenced not only for damages for the breach of the settlement agreement, but also alleging the underlying fraud.

Plaintiffs first threatened to move for summary judgment on the settlement agreement and eventually had to file the motion. Wilson's attorneys, Kirkland & Ellis, opposed the motion through hearsay affidavits and claims to the court that the parties were close to settlement. After hearing oral argument, I offered my good offices for settlement efforts. Plaintiff understandably had insisted over some period of time that any new agreement be backed up by a bond and confessions of judgment. However, after considerable nit-picking by Wilson over insignificant details which clearly appeared to be motivated solely by the "buying of time",[3]

---

1. Apparently, according to plaintiff, Wilson, even at the time he was soliciting plaintiffs' investments, was, unknown to them, already a defendant in two federal fraud and RICO actions.

2. This settlement for the total amount claimed *plus attorney's fees* speaks volumes as to the merits of plaintiffs' contentions.

3. Not only now from hindsight, but even at the time in late 1996, it was fairly obvious that Wilson was just "buying time", for in an opinion I wrote on December 20, 1996, there is a paragraph which eerily foreshadows what the plaintiffs and the court are today facing. I then wrote:

Plaintiffs claim that all of defendants' maneuvers over the past nine months have simply been a succession of tactics designed to delay the agreed-upon payment. This would appear to be so, particularly against the background of no (continued) claim of injury by defendants, and in light of some very puzzling conduct in defendants' alleged efforts to offer full payment under the settlement contract. I realize that normally settlement negotiations are privileged but here they were collectively so bizarre on defendants' part as to have all the earmarks of

plaintiffs finally asked the court to rule on the motion. The hearsay opposition was rejected and summary judgment was granted to plaintiffs in December 1996. Wilson and other various entities thereby became judgment-debtors to the plaintiffs to the extent of over $3 million dollars. Here, too, the judgment was dishonored.

Plaintiffs' counsel, Stuart Perlmutter, then went about the country trying to chase assets flowing from all kinds of transactions, with but limited success. As part of those efforts, Perlmutter, in order to endeavor to collect his clients' judgment, sought Wilson's deposition as to assets and sought discovery of the customary documents that would be logical leads to assets. Wilson failed to appear at his first duly-noted deposition and while he showed up the second time, the deposition never took place. Wilson's lawyer from the Boston firm of Gargill, Sassoon & Rudolph claimed that Wilson was too emotionally distraught to go through with it. Perlmutter accepted this and postponed but Wilson's lawyers have never rescheduled the deposition. Furthermore, as observed, while Wilson and his lawyer had come to the deposition, neither had brought documents as they were supposed to do.

Perlmutter also sought to inventory Wilson's safe deposit box in Boston. Wilson's then and now active counsel, Gargill, Sassoon & Rudolph,[4] through partner Sassoon, told Perlmutter that Wilson would not consent to any inventory of any safe deposit box and that Perlmutter could look at Sassoon's "rear end."[5] Sassoon also told Perlmutter that his purpose in being difficult was to drive Perlmutter "crazy" and fight him so that it would be extremely expensive for Perlmutter's clients and then he, Sassoon, would have Wilson file bankruptcy. Sassoon did not deny any of this when it was specifically put before him by Perlmutter in a letter to which Sassoon specifically responded. Thereafter, Sassoon consented to the safe deposit box being inventoried and unsurprisingly, by the time that was done, there was nothing in it.

Next, Patrick Waters, Sassoon's partner, being importuned by letters from Perlmutter to comply with the document production order, never bothered to answer Perlmutter's letters. I pressed Waters at the hearing last Monday as to the "why" of all this. His answer was, on any objective reading, manifestly unsatisfying. I therefore find by clear and convincing evidence that between Wilson and his lawyers in the firm of Gargill, Sassoon & Rudolph there has not been and will not be meaningful compliance with the court's April 7, 1997 order for the production of documents. While unspecific promises were made in the courtroom for future compliance, they will doubtless prove to be as hollow as those many in the past.

I address further the issue of whether Wilson's pre-bankruptcy civil contempt of this court's April 7 order is stayed by his later filing for bankruptcy on April 24. The court in *Int'l Distribution Centers v. Walsh Trucking Co., Inc.*, 62 B.R. 723 (S.D.N.Y.1986) dealt with this very problem and in an extensive opinion held that "certain civil contempt proceedings may continue even in the face of a bankruptcy petition." *Id.* at 727. As here, the court in *Int'l Distribution* was concerned with compelling future compliance after a bankruptcy filing with a pre-filing District Court order. The court determined that the contempt there was civil in nature stating that "the civil nature of the contempt is not turned criminal by the court's efforts at *vindicating* its authority, an

intentionally promoting further delay: their use of a foreign bonding company in Ohio that was of dubious stature and not subject to suit in New York; defendants' subsequent declination of a confession of judgment, even though the court said that it could be kept confidential and in escrow and surrendered on payment, which defendants repeatedly assured the court was secured by a bank loan; defendants' claimed inability to reach a banker regarding what effect a confession of judgment could potentially have on consideration of a bank loan; defendants' proposal that there be a lim-

ited "pecking order" among a number of defendants for collection of the debt, all of the foregoing collectively leading plaintiffs and the court to feel that defendants' proposed payment was of questionable good faith.

4. Patrick Waters appeared before me on Monday as the lead counsel in opposition to the contempt proceeding.

5. Sassoon acknowledged in a subsequent letter that he had made this remark.

interest which may be implicated in either civil or criminal proceedings." *Id.* at 728. (emphasis added and citations omitted). The court also found that its inherent power in that civil contempt case "to punish the debtor for contumacious conduct against the dignity of either the state or the federal court" was not curtailed by the automatic stay provision of the bankruptcy code, 11 U.S.C. § 362(a). *Id.* at 729. The threshold issue is whether the motion for contempt is made to satisfy a judgment or if it is directed at an asserted defiance of a court order—a question of fact left to the court's discretion. *Id.* Here as there, none of the relief requested involves payment of money to plaintiffs, *Id.*, but rather is intended to uphold an order of this court to compel the production of documents integral to plaintiffs' case. Accordingly, as I stated last Monday, I find that this contempt order enforcing my pre-bankruptcy order to compel discovery is not stayed by § 362(a) as it is "vindicat[ing] the integrity of the court."

In addition to my concern for upholding respect for the court, I was also moved to act by the urgency of the situation. The need for speed here is obvious, which is why I felt impelled to forthwith put in place the compulsion of incarceration of Wilson as a civil contemnor to endeavor to get compliance. The plaintiffs in this case, it is now clear, have been stone-walled for almost a year as to any disclosure. During that stone-walling, while Wilson was haggling over easily-avoidable minor issues[6], he was obviously endeavoring to avoid having to consent to judgment (now put in jeopardy) by his declaring bankruptcy last week.[7] He also during recent months has increased his life insurance from $4,750,000 to $9,750,000. A house which was bought with his money (as far as anybody can tell because discovery as to its funding has been stone-walled) was put in his wife's name and was very recently in the process of being sold by her in some unspecified transaction (the details of which were also stone-walled). I had to issue an order to preserve the status quo there, too. Wilson's wife also has flouted the court by not appearing either in person or by attorney in response to an Order to Show Cause of which she and her attorney clearly had notice. Wilson's and his wife's customary bank account has been reduced to a sum of some $50, and discovery has been stone-walled as to any transfers of monies or subsequent account(s). In the bankruptcy filing of Wilson's company, Republic Management, Inc., the schedule of Republic's debtors omitted the plaintiffs as judgment-creditors here. Wilson signed this schedule under penalties of perjury and the omission of the plaintiffs' judgment, it is clear, was deliberate. This appears to be also motivated by the announced purpose to discourage Perlmutter and his clients by putting them to substantial expense and irritation to get the record straight.[8]

Immediate compliance with document production and disclosure is therefore necessary here not only for a vindication of the court's authority, but also to prevent further secretion of assets by Wilson and to undo the numerous efforts that obviously have already been made by him to put his assets beyond any creditor's reach at any time. The judgment-creditors here have been the victims of this conduct for over a year. They are entitled to immediate disclosure of the materials that this court has so far ordered in vain.

Finally, I observe that Wilson aborted his deposition by going to it and then asserting that he was too emotionally and physically depleted to proceed with it and Mr. Perlmutter credited this and adjourned the deposition. As to whether he was in fact in such a condition on that day I need express no opinion. However Waters, Sassoon's partner, asserted to me on Monday, as a ground for not ordering Mr. Wilson to the MCC in civil contempt, that his health should be considered. I but note in denying that request that Mr. Wilson had been in the courtroom for close to two hours before this request was made. After he was pointed out to me, I observed him as an active participant with his lawyer in furnishing information, running back and forth from his seat in the spectator benches to the lawyer, audibly making remarks, and gesticulating about things he had heard throughout the rest of the proceeding.

---

**6.** *See supra* note 3.

**7.** As Sassoon told Perlmutter he would do after driving him "crazy."

**8.** This matter is dealt with in some detail in the minutes of Monday's hearing.

Further, aside from Waters' statement about a health problem, there was no offer to me, at a minimum, of some statement from Mr. Wilson as to the state of his health, let alone a doctor's certificate which is often offered to the court in such circumstances. The claim of poor health as a bar here is patently belied by the total record I had before me in the court.

Accordingly, the foregoing constitutes further findings of the court in support of its order, stated on the record on April 28, that Mr. Wilson be placed forthwith in the MCC in civil contempt until he purges himself by compliance with the court's written order of April 7, 1997 as supplemented by the court's further directives in the April 28 transcript.

The foregoing is so ordered.